BAIL BONDS BY MARVIN NELSON, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bail Bonds by Marvin Nelson, Inc. v. Commissioner
Docket Nos. 7083-73, 10026-75.
United States Tax Court
T.C. Memo 1986-23; 1986 Tax Ct. Memo LEXIS 585; 51 T.C.M. (CCH) 294; T.C.M. (RIA) 86023; January 21, 1986. Ondrej M. Kojnok and Doris Brin Walker, for the petitioner. William E. Bonano, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION Drennen, Judge: These consolidated cases were assigned for trial or other disposition to Special Trial Judge Fred R. Tansill pursuant to section 7456(c) [1] and General Order No. 6 of this Court, 69 T.C. XV (1978). See also Rule 180 and Rule 181. *586 The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. TANSILL, Special Trial Judge: Respondent determined deficiencies in petitioner's taxable years (fiscal years ending each June 30) 1970, 1971, and 1973 for its Federal income taxes in the respective amounts of $9,660.54, $8,398.25 and $500, plus additions to tax under section 6653(a) in the respective amounts of $483.03, $419.91, and $27.50. By amended answers, respondent also set out an alternative position asserting deficiencies pursuant thereto of $11,587.16, $3,082.33 and $2,688.22 in the respective fiscal years. The cases have been consolidated for trial, briefs, and opinion. The issues initially raised by the pleadings are: (1) whether petitioner may deduct $19,019.43 in taxable year 1970 and $26,434.05 in taxable year 1971 claimed as reinsurance expenses paid to Farlia, N.V. (Farila); [2] (2) whether petitioner may deduct $50 in taxable year 1970, $1,110.52 in taxable year 1971, and $2,500 in taxable year 1973 claimed as expenses for interest paid to Anglo Dutch Capital Company (Anglo Dutch);[3] and (3) whether any part of any deficiency is due to petitioner's negligence *587 or intentional disregard of the applicable rules and regulations under section 6653(a). Respondent's basic position *588 is that the insurance and interest transaction were simply documented "money movements," shams having no economic substance, thereby producing no actual, deductible expenses. Respondent argues in the alternative, by way of amended answers, that even if this Court finds that petitioner may deduct the claimed business expense payments for reinsurance in issue (1) above, nevertheless, petitioner may not deduct expenses in the respective amounts of $22,752.49 in taxable year 1970, $12,150.07 in taxable year 1971, and $9,719.19 in taxable year 1973 claimed (and originally allowed) for court costs, forfeitures, and skip-tracing expenses in each of those fiscal years. Respondent's denial of such deductions is on the ground that the expenses so claimed would have been subject to reimbursement under the reinsurance contract. Respondent has conceded entertainment expense deductions of $1,380.50 for the 1970 taxable year and $750 for the 1971 taxable year. Petitioner challenges all of respondent's positions asserting that form and substance are the same. These cases have a long and unusual procedural history, in the process producing various threshold issues which must be addressed prior *589 to any consideration of the consolidated case on the merits. We now consider these preliminary matters. PRELIMINARY FINDINGS OF FACT
Bail Bonds by Marvin Nelson, Inc. (petitioner or Bail Bonds) was a California corporation, chartered on June 19, 1969. During the taxable years in issue Marvin Nelson (Nelson) was the sole shareholder and president of petitioner. Nelson was a bail bondsman, licensed pursuant to the statutes of the State of California. [4] Petitioner was a cash basis taxpayer using a July 1 to June 30 fiscal year. *590 Petitioner timely filed its Federal corporate income tax returns for the years in question, claiming the deductions discussed above. Respondent denied the insurance expense and interest deductions, as well as the entertainment expense deductions, and determined the additions to tax in separate notices of deficiency dated July 19, 1973 (for the 1970 and 1971 taxable years in docket No. 7083-73) and September 19, 1975 (for the 1973 taxable year in docket No. 10026-75). The corporation timely filed petitions in this Court in each instance. On August 4, 1978, petitioner, by its attorney Harry Margolis (Margolis), moved to amend both petitions to plead additional facts and claim the application of collateral estoppel in support of its position; that motion was denied. On October 13, 1978, Margolis moved to consolidate more than 600 cases then on file and awaiting trial in this Court, including the two cases of petitioner herein. This motion was premised upon the grounds that respondent had acted illegally and in contravention of the Constitution of the United States in obtaining evidence against the taxpayers in those cases, all of whom were, or had been, law clients of Margolis, *591 and that those taxpayers had been improperly selected for audit and arbitrarily subjected to adjustments. The motion was denied by order dated October 30, 1978. On September 10, 1979, petitioner filed amended petitions in both dockets, pursuant to leave of the Court, raising these same arguments, which respondent denied by answer. Respondent, on brief, has argued that the amended portion of the petition should be stricken, while petitioner seeks judgment on these grounds. In June and September 1979, these cases were tried in California before Judge William Quealy. At that time a joint stipulation of facts, with attached exhibits A through AT and 1-13, was filed pursuant to Rule 91. A supplemental stipulation of facts later was filed to correct an arithmetic error in the original stipulation. After the cases were tried, briefed and submitted in 1979, but before any findings of fact were made or opinion written, Judge Quealy retired from the Court in 1980. These cases then were reassigned to Special Trial Judge Fred R. Tansill. After receivng notice of reassignment, petitioner moved for a new trial. This motion was granted over respondent's objection, and the parties were *592 ordered to stipulate to the fullest extent possible to all agreed facts, testimony, and exhibits before a second trial. A Second Supplemental Stipulation of Fact was filed with the Court on April 20, 1981. Attached thereto were documents labeled as exhibits D through BF (omitting exhibits F, S, U, W, Y, AB, and AG) and 1 through 14 (omitting exhibit 9), with reservations regarding some of the documents. Prior to the second trial before this Court, each party filed a motion for an order to show cause why certain proposed stipulations of fact and documents should not be deemed admitted. Hearings on these motions and the trial do novo were held in June, 1981. During those proceedings, the motions for show cause orders were rendered moot and discharged by order upon the parties' filing of a Third Supplemental Stipulation of Fact. This stipulation revised language in the previous stipulation which described exhibit BE, and further stipulated the admission of exhibit AF. A Fourth Supplemental Stipulation of Fact was filed on August 10, 1981. Petitioner has objected to the admission of several of the documents attached to these stipulations as well as to several documents admitted *593 at trial. Before and during the second trial, and over petitioner's objection which he maintains on brief, we ruled that all facts stipulated in the first trial and all exhibits received in evidence in the first trial remain admitted and part of the record of these cases. The Third Supplemental Stipulation also added language in the description of documents which were attached to both that stipulation and the original stipulation. The additional language had the effect of limiting respondent's stipulation to those documents, and respondent objects to the elimination of such additional language. We took this issue under advisement. The record in this case also includes, by stipulation, some of the witnesses' testimony from the first trial. Additionally, prior to the first trial, the Court had granted a joint motion for the admission into that record of the testimony of Alfred H. Harris given during the trial of Alan B. Karme and Laila M. Karme v. Commissioner, docket Nos. 3059-73 and 9798-74 (reported as Karme v. Commissioner,73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982)). At the second trial of these cases, this Court admitted the *594 Harris testimony over an objection to such admission raised by petitioner. Petitioner maintains this objection in its brief. THRESHOLD ISSUES
Against this convoluted background, we must first determine what evidence is properly before us prior to making any findings of fact based upon that evidence. In this process we must also consider whether petitioner's prayers for summary judgment, based upon the amended petitions, or its claimed defense of collateral estoppel requires judgment in its favor. Each of these matters now will be considered. A. Amended Petitions
Petitioner argues that its amendments to the petitions comply with the standards of Federal pleading by making "a short and plain statement of [its] claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). [5] In its amended petitions, petitioner alleged that it was not selected for audit, nor was the audit conducted, by a regular or proper procedure. Rather, petitioner claims, respondent had predetermined the adjustments to its returns as a result of the so-called "Bahamas Project," an IRS investigation into offshore tax shelters. Petitioner *595 claims that, as a result of that investigation, clients of attorney Margolis were singled out for audit, which, it claims, violated the subject taxpayers' constitutional rights. Petitioner asks this Court to exercise "supervisory power over respondent's activities," to shift the burden of proof to respondent, which we treat as a motion to shift the burden of going forward with the evidence to respondent, and to find for petitioner summarily on the merits. As discussed above, we originally denied petitioner's motion to so amend its petition in 1978. The order denying that motion referred to our Memorandum Sur Order, dated October 27, 1978, in the case of Karme.Therein we decided a similar motio involving clients of Margolis and the "Bahamas Project," and we reach the same result in this case. It is the established rule of this Court not to look behind the notice of deficiency to consider the propriety of respondent's motives or procedures. E.g., Jackson v. Commissioner,73 T.C. 394 (1979); Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974). Even *596 if we may exclude evidence determined to have been obtained illegally, (in this regard see Guzzetta v. Commissioner,78 T.C. 173 (1982)), the existence of such facts would not preclude us from considering the case on the merits of the admissible evidence. While petitioner has objected to the admission of some evidence in this case (see discussion infra), the amended petitions do not allege that any specific piece of evidence has been obtained in violation of the Fourth Amendment to the United States Constitution; no particular item or document was objected to on this ground. Rather, it is claimed that respondent's conduct of the "Bahamas Project" involved behavior which was in violation of the law and of petitioner's constitutional rights, and that the method of audit was arbitrary and illegal. Such claims do not allege facts which, even if true, would support a finding for petitioner in this Court. Cf. Church of Scientology of California v. Commissioner,83 T.C. 381, 447-454 (1984). For the same reasons stated in the Memorandum Sur Order in Karme,[6] we will only consider the issues in petitioner's case on their merits. Accordingly, *597 respondent's motion to strike is granted to the extent that the amended petitions seek a summary decision in petitioner's favor, a shift in the burden of going forward, or exercise of this Court's "supervisory powers" based upon respondent's conduct of the "Bahamas Project" or the audit procedures in such cases. B. Collateral Estoppel
Petitioner claims in the amended petitions [7] that determinative issues in this case already have been litigated in previous cases in this Court and that, pursuant to the doctrine of collateral estoppel, respondent should be precluded from raising those same issues in this case. Petitioner cites the opinions in the following cases as precluding respondent from raising the substance versus from argument in this case: Brock v. Commissioner,59 T.C. 732 (1973); Abraham v. Commissioner,T.C. Memo. 1974-19; Estate of Cole v. Commissioner,T.C. Memo. 1973-74; Hill v. Commissioner,63 T.C. 225 (1974); and Anglo Dutch Capital Company v. Commissioner, docket Nos. 6105-71, 4129-72, 3343-74, 9376-74, 10488-75, 7845-78, 311-79. *598 In the recent case of Wright v. Commissioner,84 T.C. 636, 639 (1985), we stated that "[t]he doctrine of collateral estoppel precludes relitigation of any issue of fact or law that is actually litigated and necessarily determined by a valid and final judgment." The doctrine, however, "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." Commissioner v. Sunnen,333 U.S. 591, 599-600 (1948). The facts and issues with which we are concerned in this case are whether loans from Anglo Dutch to petitioner represent valid indebtedness, whether payments by petitioner to Farila represent valid business expenses, and whether Margolis effectively controls Farila, ABC, and Anglo Dutch. None of these issues was actually litigated and necessarily determined in the cases cited by petitioner. Hence, respondent is not collaterally estopped from raising these issues in this case. *599 In its brief, petitioner argued that the modifications made by Parklane Hosiery Company, Inc. v. Shore,439 U.S. 322 (1979), and Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,402 U.S. 313 (1971), to the doctrine of collateral estoppel permit the application of collateral estoppel in the present case. We agree with petitioner that those cases allow the offensive use of collateral estoppel in certain circumstances and abandon the strict application of the doctrine of the mutuality of parties. Cf. McQuade v. Commissioner,84 T.C. 137 (1985). We have, however, found that the facts and issues to be determined in the present case have not been litigated and previously determined in any of the cases cited by petitioner. Neither Parklane nor Blonder-Tongue would require or allow the use of collateral estoppel under these conditions. Also, petitioner has moved to augment the record in this case by submitting the following additional documents and requesting us to take judicial notice thereof: 1. Findings of fact and conclusions of law by the Superior Court of the State of California in five cases *600 which involve, as parties, the following individuals and entities: Douglas R. McAvoy; Margolis; Anglo Dutch; Aruba Bonaire Curacao Trust Company, Ltd. (ABC); Customcraft Construction Company; and World Minerals N.V. (Minerals); 2. Stipulations of facts and the "judgment" of this Court in the Cole,Brock, and Abraham cases, cited above; and 3. This Court's orders of dismissal and decisions in the following cases: Anglo Dutch Capital Company, a California Corporation v. Commissioner, Docket Nos. 6105-71, 4129-72, 3343-74, 10488-75, 7845-78 and 311-79. These cases were dismissed upon respondent's motion with decisions that there were no deficiencies in these cases. No findings of facts were made. We hereby grant petitioner's motion to augment the record only to the extent that this Court will take judicial notice of the fact that findings of fact and conclusions of law were made in the referenced cases in the California Superior Court and that this Court has entered a decision in the Cole,Brock,Abraham, and Anglo Dutch cases. However, we are not bound by the California Court's findings since, for among other reasons, the same or similar issues *601 were not addressed. [8] No findings of fact or conclusions of law were made in the Anglo Dutch cases in this Court, since they simply were dismissed upon respondent's motion. Thus, they are of no binding effect here. The decisions of this Court in Cole,Brock, and Abraham were based upon facts involving different transactions and resolved different issues than are involved in the present case. They also are of no binding effect here. Thus, to the extent that petitioner's motion to augment the record is granted, no additional facts or rulings are incorporated into the record here which are dispositive of any issue presented in the consolidated case. *602 Petitioner's motion to augment the record through judicial notice also is denied to the extent that petitioner would have an consider stipulations of fact in any case other than the the one presently before us. Rule 91(e) provides that a stipulation shall be binding "only in the pending case and not for any other purpose, and cannot be used against any of the parties thereto in any other case dor proceedings." We shall abide by our own rules and limit stipulations to their proper scope. Therefore, no stipulation in any other case shall, without further stipulation here, be considered in the matter now pending. C. Evidentiary Questions
Petitioner objects to the admission of certain exhibits which were attached to the stipulation of facts in the original trial of this case. Respondent objects if the document descriptions in the Third Supplemental Stipulation of Fact (which limit his agreement to admission of the documents) are not considered and the exhibits are admitted without qualification, pursuant to the initial stipulations. Rule 91 establishes the requirement, form, and effect of stipulations. Subsection (e) thereof states, in pertinent part: "The Court will not *603 permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires." Accordingly, we require each party to show why "justice requires" that the stipulations they entered into should be changed. Petitioner claims that so far as the Harris testimony was made part of the record in the first trial by joint motion of the parties, [9] the opportunity to confront and cross-examine the witness was denied. However, that was the same situation at the time the original stipulation was made, and no facts shown to us change the effect of that condition. Therefore, we conclude that, since petitioner is in the same position vis-a-vis the stipulated testimony as it was at the time of the stipulation, justice does not require that the stipulation be withdrawn. We reach the same result regarding the admission into the record of exhibits attached to the original stipulation, despite the parties' supplemental stipulations. The supplements have the effect of withdrawing *604 some of the exhibits originally stipulated, though others were added, and limiting respondent's admission regarding certain of the exhibits. Apparently, the parties did this under the impression that the second trial constituted a new case. [10] No findings of fact or conclusions of law were made after the first trial, so neither party can show a prejudicial effect resulting from the original stipulation. Consequently, we hold that all documents and exhibits admitted as part of the original stipulations, with the description there used, shall remain in the record of this case. Pursuant to Rule 91(e), all stipulations of fact submitted by the parties, plus all of the exhibits attached to each of the stipulations, shall be considered as part of the record in this case. Where a supplemental stipulation coorrects an original stipulation, the latter shall be given effect. However, where a supplemental stipulation attempts to retract or would have the result of retracting or limiting a prior stipulation or exhibit attached thereto without agreement of the parties, such supplemental stipulation shall not be given effect. *605 However, we hold otherwise where reservations regarding admissibility of an exhibit were made on the original stipulation. Respondent objected to the admission of exhibit AG (a schedule prepared for trial showing amounts due to Farila offset by amounts due from Farila), objected to the authenticity of exhibit 2 (the contract between Nelson and Farila), with the exception of the signature of Nelson, and objected to the authenticity of exhibit 11 (consisting of three promissory notes) with the exception of the signature of Nelson. We rule that each of the exhibits is admissible. In so doing we express no opinion at this time regarding the truth of the matters asserted therein or the validity of the transaction intended to be represented thereby. Those arguments effectively constitute respondent's position on the "form versus substance" question in this case, upon which we will rule, infra.
Petitioner also objects to the admission of bank records of Banco Popular Antilliano, N.V. (hereinafter "Banco Popular"), located in Curacao. The records were submitted through IRS agent Reller who testified that they were obtained from Banco Popular through the Netherland Antilles tax *606 authorities. The records purport to show the circular nature of the transactions among entities which respondent claims were controlled by Margolis. Petitioner objects on grounds of authenticity, i.e., no competent witness has shown that the documents are what respondent claims they are, and hearsay, i.e., petitioner has been been unable to cross-examine anyone concerning either the creation of the documents or the transmittal of the documents to the IRS. We addressed the same arguments in Karme, and ruled that the foreign bank records were admissible. We do the same here. It is noted that the United States Court of Appeals for the Ninth Circuit, in affirming our opinion in Karme, held that Fed. R. Evid. 803(24) permits receipt of foreign bank records in evidence where, as here, they are material, probative and serve the interests of justice. With the exception of exhibit BL, the exhibits to which petitioner objects were attached to the original stipulation. As we ruled, supra, the original stipulation and the documents appended thereto shall remain in this record. Additionally, the exhibits are admissible under Rule 803(24), Fed. R. Evid. *607 The records are material and probative regarding the question of the structure, the form, and the substance of the transactions upon which this case centers. No more probative evidence is available because Farila is a non-party foreign entity, not subject to process of this Court. Certainly, the purpose of these rules and the interest of justice will be served best by admission of this evidence. By so doing we are able to scrutinize more closely the nature of the transactions which are the subject of this case. The inclusion of these exhibits in the stipulation of facts served as notice to petitioner as to the particulars of the documents and respondent's intent to use them. Finally, we believe that the documents contain sufficient guarantees of trustworthiness to satisfy Rule 803(24), Fed. R. Evid., as an exception to the hearsay rule and Rule 901(b)(4), Fed. R. Evid., as to authenticity. Under the circumstances of having been requested under Article XXI of the Netherlands-United States Income Tax Treaty, 62 Stat. 1757, 1766, T.I.A.S. No. 1855 the form, printing, entries, and entities named on the documents *608 before us convince us, upon careful examination and detailed consideration, that they are what they purport to be--accurately recorded bank records of entities involved in this case. We admit them into evidence, supported independently either on this ground or upon the reasoning that they were stipulated by petitioners in the first place. Therefore, there is no need for us to consider the "business records" exception to the hearsay rule, Rule 803(6), Fed. R. Evid., and the chain of custody of the evidence necessitated thereby. We must reach a different result, however, regarding exhibit BL. That exhibit is a handwritten note, its author unknown. Although it was obtained by the same process as the other exhibits so challenged by petitioner, it is in a totally different form. Significantly, petitioner was not notified of its intended use prior to trial, as required by Rule 803(24), Fed. R. Evid.Although respondent has cited cases providing exceptions to this requirement, they are distinguishable. Respondent did not offer exhibit BL only in rebuttal of petitioner's presentation, as in United States v. Iaconetti,540 F.2d 544 (2d Cir. 1976), *609 nor had petitioner ever been in possession of the document, as in Furtado v. Bishop,604 F.2d 80 (1st Cir. 1979), cert. denied 444 U.S. 1035, (1980) nor does the exhibit escape classification as hearsay as an admission under Rule 801(d)(2), Fed. R. Evid. While an "admission" encompasses a statement made by the agent of a party, there is no evidence here to indicate who wrote the note constituting exhibit BL. Reference therein is made to "Adolphson," an employee of the Margolis office during this time, thus an agent of petitioner. Respondent speculates that exhibit BL comprises the notes of an employee of Banco Popular regarding a telephone call from Adolphson. Although this is possible, as even Adolphson stated at trial, he had no recollection of the conversation or the transactions allegedly the subject thereof. Therefore, it is at best speculation to decide that whoever wrote the note was doing so in the capacity of agent of petitioner. Based on these reasons, and despite the similarity of the information on exhibit BL to information in other exhibits, we must reject the offer of exhibit BL into evidence and give *610 it no weight in our consideration of the facts of this case. All other documentary evidence is admissible, as discussed supra, and will be considered. Having disposed of various preliminary matters, we now move to the substantive findings of fact relating to the merits. Because of the nature of respondent's disallowances and petitioner's defense of the form employed by the parties, it is necessary to delve deeply into the operations of petitioner, searching for the substance of transactions. FINDINGS OF FACT [11]
Marvin Nelson, an individual, was a bail bondsman licensed in the State of California. In 1969 he incorporated his business as Bail Bonds by Marvin Nelson, Inc. (petitioner) with its principal place of business in Berkeley, California. Nelson was the president and the sole shareholder of petitioner during the years in issue. Nelson's attorney in 1969 was Arthur Wells, Jr. (Wells, Jr.), a California attorney. Wells, Jr. introduced Nelson to attorney Margolis *611 in 1969 in order to incorporate the business and to prepare a tax plan. Generally, a bail bondsman contracts with an authorized insurance company that will act as surety on the bonds posted by the bondsman. Under these surety arrangements, the bondsman acts as agent, posting bonds for the surety or insurance company which supplied the bond to the bondsman. Prior to incorporating Bail Bonds, Nelson contracted with several such insurance companies to act as surety for the bonds he wrote. Pursuant to these contracts, a specified percentage of fees collected by Nelson was required to be paid to the surety. In addition, a deposit of 1 percent of the bond was routinely required to be placed in a reserve account with the surety company. This reserve created a trust account controlled by the surety that was available in case of default by the bondsman in his dealings with the surety. At the termination of the surety contract, the reserve account was paid to the bail bondsman, less any outstanding amounts on which the surety was liable. Nelson entered into such an insurance surety contract with Resolute Insurance Company on January 6, 1967. This contract remained in effect until February *612 1970. He then entered into an agreement with United Bonding Insurance Company. This agreement continued until November of 1970, when an agreement with Wilshire Insurance Company was entered into. All required reserve account payments were made to these companies when the insurance premiums were paid. The cost of these arrangements was $17 per thousand of bond purchase, with $16 thereof allocated to premium and $1 to the reserve account. Since Nelson charged his clients a fee of 10 percent of their bonds ($100 per thousand of bond purchase), these surety contracts cost him 17 percent of his bail bond income. Both before and after incorporating his business, Nelson was personally engaged in obtaining clients, spending much of his time out of the office. He did none of the bookkeeping or maintenance of records himself. His bookkeeper was Tillie Chesney, and Patricia Miller (Patricia) was his secretary. Patricia married Nelson in 1972. She was trained in bookkeeping by Tillie Chesney. Patricia did the routine office work for Nelson and for Bail Bonds after its incorporation. Either Tillie Chesney or Patricia prepared checks for corporate expenses which Nelson would sign on behalf *613 of petitioner, without inquiry or question. Nelson relied on Tillie Chesney and Patricia, who in turn received direction from Wells, Jr., or Margolis, to pay expenses and keep necessary records for the transactions involving Anglo Dutch and Farila. Arthur Wells, Sr., (father of Wells, Jr.) an attorney and C.P.A., prepared petitioner's tax returns for the periods ending June 1969 through June 1973. He prepared these returns from books and records of petitioner and advised Tillie Chesney regarding the recording of items only for tax purposes. He was not involved in petitioner's regular record-keeping activities. Wells, Jr., was the attorney upon whom Nelson relied primarily for advice and direction regarding the day-to-day conduct of the bail bond business, although others were occasionally consulted. Nelson considered Margolis to be his attorney for tax purposes only, since Margolis was not familiar with the bail bonds business. On May 11, 1969, Nelson signed an insurance contract (Reinsurance Agreement) with Farila. Farila was a Netherlands Antilles corporation. Its managing director and president during the years in question was Dirk Kuijper; its vice president was C. B. *614 Siebesma. These individuals also worked for Curacao International Trust Company (CIT), a Netherlands Antilles company organized by Dr. A. A. G. Smeets. CIT represented numerous corporations in that jurisdiction providing domicile, bookkeeping, accounting services, and corporate officers. Farila was such a company, domiciled in Curacao by CIT. Farila was registered in the Netherlands Antilles as an investment company. Its Articles of Incorporation stated that its registered capital upon incorporation in December 1968 was $10,000 and that its business purpose was to deal in securities, other personal property, and realty. It filed income tax returns in the Netherlands Antilles in 1969 and 1970. Farila's only reported income in 1969 was $9,260 in interest and dividends; and in 1970 it had interest of $4,580, capital gains of $27,674.01, and "Non-U.S.A." commissions of $3,440.27. No payments by petitioner are reflected on these returns. Farila was a "system entity" in the Margolis organization's "system." The Margolis law office, in the process of tax-planning for clients, dealt with various entities and arranged transactions between these entities, including foreign corporations *615 and trusts set up and operated through CIT (such as Farila and ABC, whether or not set up by the Margolis office), [12] entities directly owned or controlled by Margolis (such as Anglo Dutch), and corporations, partnerships, trusts, and businesses set up, operated by, or invested in by his clients (such as Bail Bonds). In the case of foreign entities not directly controlled by Margolis, there was a high degree of cooperative support amounting to effective control. [13] All these entities were referred to by persons working in the Margolis' law office as "system entities," as they were operated by or through, or dealt with by, the Margolis organization or "system." In some instances, accounting records were kept and maintained in the Margolis law office. At the direction of an attorney from Margolis' office, these entities would transact with each other and with Margolis' clients or on behalf of these clients having accounts with those entities. A "money movement" occurred when, pursuant to directions from Margolis' office, funds were transferred between system entities, or from or through an account maintained at a bank used by Margolis (such as Banco Popular, Union Bank, or Barclays *616 Bank). When a client of the Margolis office, or a "system entity," engaged in a transaction, a written record of that transaction would be made and kept by the Margolis attorney.This was called a "system account." These were not documents which reflected accounting procedures in the formal or traditional sense. Rather, they were an informal record of the money paid by the client "into" the system, transactions undertaken with that money or on behalf of that client, and money paid to the client "out of" the system. "Circulating" transactions were those in which funds passed among or between system entities, with no money coming into or going out of the system. Not all of these "system accounts" were available for entry into the record of this case. However, such records were kept by Margolis' office for Nelson, Farila, Anglo Dutch, and ABC and were part of the record in this case. Money paid into the *617 system by a client would be added to the client's account, and amounts paid out would be deducted. [14] Amounts paid as interest to a system entity would be recorded as paid into the system. In some cases, interest would accrue on a client's system account balance. In some instances, money "paid in" would be available to the client in the future or would reduce an existing deficit. The directions for the activities undertaken by Farila for Margolis clients and system entities came from Margolis' office. His office would send drafts of letters and transactions to CIT ("planning memoranda") which would, in turn, prepare the requested documents verbatim on Farila stationery to be signed by an officer of Farila who was also employed by CIT. Margolis was a client of CIT. He effectively controlled the operations of Farila through the services *618 of CIT and paid administrative fees to CIT for these services. Arrangements for contractual agreements, payment of expenses and other transfers of funds, and communications from Farila were accomplished at the direction of Margolis, usually by the use of the verbatim letters, or "planning memos." The Reinsurance Agreement of May 11, 1969, between Nelson and Farila, provided as follows: AGREEMENT
FARILA N.V., a Netherland Antilles Corporation, hereinafter referred to as "Insuror", and MARVIN NELSON, a married man, hereinafter referred to as "Insured", entered into this agreement effective as of March 1, 1969. The terms and conditions of this agreement are as hereinafter set forth. 1. Insured has conducted business as a sole proprietor, a licensed bail bond broker in the State of California, United States of America, with his primary place of business in Berkeley, County of Alameda, doing business in Alameda and surrounding counties. Insured is to incorporate the operation of the bail bond business under the laws of the State of California no later than July 1, 1969. This Agreement shall then be adopted by said Corporation and shall replace the present proprietorship *619 guarantee in all respects. 2.The sole proprietorship as insured shall pay to insuror twenty per cent (20%) of the gross revenue of the sole proprietorship for the period commencing with the effective date of this Agreement, until its termination. The Corporation to be formed shall pay the same per cent of gross revenue within thirty days after the end of each calendar year so that payments for the sole proprietorship and the Corporation shall be brought current no later than January 31, 1970. 3. Premiums payable hereunder may be paid on an annual basis each January or may be paid currently for which there shall be allowed to the insured an immediate reduction in premium of five per cent (5%) of the total premium. 4. All Statements of Charges on bonds written during the life of the Agreement shall be supplied to Insuror within forty days after the posting of such bond in order for this Agreement to be effective.Deposit in the United States mail shall be considered to be delivery except that the requirement of proof of mailing shall be that of the insuror. There shall be no deduction from gross in any case where proper notice has been given. 5. In addition to the foregoing, *620 Insured shall render to Insuror, upon request, an accounting of all business transacted. 6. Insuror shall pay to Insured all net losses suffered by Insured by reason of bail forfeitures and expenses connected therewith, the total of such losses within 90 days after notice to Insuror that Insured shall have been required to pay such loss. Insured shall promptly notify Insuror of any forfeiture of any bond. Insuror's liability for said losses shall not exceed $20,000.00 per person unless Insuror expressly consents thereto in advance in writing. 7. Insured shall do all things necessary to minimize risks of loss, including, but not limited to, exercising care regarding the writing of bonds, requiring collateral when appropriate, promptly undertaking to apprehend bonded persons who have caused forfeiture of their bond, and employing personnel to seek out and apprehend such persons. Insuror shall pay expenses of Insured incurred in preventing or exonerating forfeitures not to exceed $1000.00 per bond. 8. It is understood that Insured is required to place on reserve one per cent (1%) of the sum of all surety bonds written. Upon demand, at anytime after one year from the date *621 of this agreement, or when gross premiums paid hereunder exceed $30,000.00, whichever is later, Insuror shall place on reserve for Insured all sums which Insured has been required to post through December 31, 1969, in order to free said sums to Insured for business purposes. Thereafter, Insured shall post or replace Insured's reserves semiannually. 9. Insuror shall extend to Insured a $500,000.00 cash bond reserve. Said cash bond reserve shall be available in increments of $100,000.00 each at the then prime rate of the Bank of America. Such prime rate shall apply for a period of one year and shall be in addition to a charge of $5000.00 for each $100,000.00 of outstanding loan payable, and shall be payable annually. All borrowed funds shall be used forthwith and shall turn over not longer than every 270 days. 10. This Agreement shall terminate forthwith should any license or charter necessary to the operation of Insured's business be terminated or revoked. Insured shall give Insuror prompt notice of such event. 11. Insured may not assign, hypothecate or pledge this Agreement or any rights therein. 12. All notices shall be given to Insuror at Handelskade 8, Willemstad, *622 Curacao, N.A. and to Insured at 1711 University Avenue, Berkeley, California. Dated: 5-11-69 FARILA N.V. /s/ Dirk Kuijper, President /s/ Marvin Nelson The Reinsurance Agreement did not require Farila to act as a direct surety on bonds sold by petitioner.Rather, it was to be secondarily liable if another insurance company (under contract with petitioner) would not pay under a bond or where petitioner became liable for a bond forfeiture. In those events, the condition precedent to Farila's liability required that a Statement of Charges be "supplied" to Farila within forty days after the posting of such bond by petitioner. The record here fails to show that any such Statement of Charges was ever "supplied" by petitioner or any of its employees or its attorney, Wells, Jr., to Farila.Thus, the potential liability of Farila under paragraph 4 of the Reinsurance Agreement was never made effective by a Statement of Charges from or on behalf of petitioner. Section 6 of the Reinsurance Agreement provides that, in order to recover its losses, petitioner must send prompt notice of any bond forfeiture to Farila. Petitioner only reported ond insurable loss to Farila, a $15,000 potential *623 forfeiture occurring in July, 1970 that would become final in July, 1971 if petitioner did not locate the bonded person. No evidence was presented to show whether or not this amount was eventually recovered from Farila. A letter dated March 2, 1971 sent by Wells, Jr. to Farila states that petitioner "has not bothered [Farila] with forfeitures not exceeding $5,000" because petitioner did not want "to make the contract so unfair that [Farila] might cancel" and that "when the contract was made, it was mainly to protect against large forfeitures." However, most of the bonds written by petitioner during the years at issue were for amounts less than $5,000. During the period the Reinsurance Agreement was in effect, petitioner continued to contract with other bail surety companies. Farila never reimbursed petitioner for its insurable expenses and forfeitures incurred. Petitioner only made two premium payments to Farila. The first payment was made March 20, 1970 in the amount of $19,019.43. The second payment was made on May 12, 1971 in the amount of $26,403.05. [15] The books and records of petitioner do not reflect a calculation, pursuant to the agreement with Farila, to determine *624 the 20 percent of the bond income amount due as premium payment. Neither Nelson, Patricia, Tillie Chesney, Wells, Jr., nor Wells, Sr. made such a computation. The record does not disclose how the amounts of $19,019.43 and $26,403.55 were determined. However, a handwritten note in petitioner's book and records reflects a prorated amount of insurance payments due for 5 months, based upon "20 percent of gross," to equal $7,138.20. It appears that this refers to the 5 months between July 1, 1971 and November 30, 1971. The note indicates that this and other expenses were not reflected on petitioner's profit and loss statement for those months. Petitioner's gross bond premium income, forfeitures, and skip-tracing expenses paid for the calendar years ending December 31, 1970 through December 31, 1974 and for the partial years preceding and following those years were as follows: Court Costs
Premium
20 Percent of
Forfeitures,
Period
Income
Premium Income
and Skip-Tracing
7/1/69 - 12/31/69
$ 94,462.40
$ 18,892.48
$ 3,391.30
1/1/70 - 12/31/70
149,777.42
29,955.48
26,606.70
1/1/71 - 12/31/71
97,966.41
19,593.28
10,800.92
1/1/72 - 12/31/72
92,227.03
18,445.41
10,506.57
1/1/73 - 12/31/73
52,655.95
10,531.19
10,035.76
1/1/74 - 6/30/74
36,657.85
7,331.57
2,771.94
TOTAL
$523,747.06
$104,749.41
$64,113.29
*625 Petitioner maintained its books and records on a fiscal year basis ending each June 30, while paragraphs 2 and 3 of the Reinsurance Agreement called for an annual accounting on a calendar year basis. These same items based on the petitioner's fiscal year were in the amounts as follows: Court Costs
Premium
20 Percent of
Forfeitures, and
Year Ended
Income
Premium Income
Skip-Tracing
6/30/70
$171,408.94
$ 34,281.79
$22,752.49
6/30/71
128,883.98
25,754.80
12,150.07
6/30/72
92,673.71
18,534.74
8,289.75
6/30/73
68,288.74
13,657.75
9,719.19
6/30/74
62,473.20
12,494.64
10,841.20
TOTAL
$523,728.57
$104,723.72
$63,752.70
There was no evidence of termination of the Reinsurance Agreement by the parties. There was no written notice of termination submitted in evidence nor was there any testimonial or other evidence that such a termination had in fact occurred. The cumulative amounts due from Farila more closely approximate the cumulative amounts owed to Farila in 1974 than in any other year after the year of last payment by petitioner (1971). However, there is nothing in the record of this case to show the recognition by petitioner *626 of any such amounts due from or owed to Farila. Aruba Bonaire Curacao Trust Company Limited (ABC) was another Netherlands Antilles corporation owned and operated by officers of CIT, and was also a "system entity." It was a trust management company, set up by CIT personnel, which managed numerous trusts for CIT clients.Margolis had a working relationship with ABC, as he had with several management employees of CIT, and he often recommended it as trustee to his clients. When engaging in transactions related to clients of Margolis, ABC would operate from planning memoranda, discussed supra, prepared at the Margolis office. Margolis or a member of his staff effectively controlled the transactions entered into by ABC, to the extent that such transactions related to Margolis' clients or their accounts. On June 10, 1971, Nelson executed a power of attorney appointing Godfrey Johnson as his attorney to establish a trust with ABC as Trustee. A document styled "TRUST AGREEMENT" and an attached document entitled "BASIC TRUST AGREEMENT" were executed in the name of Nelson "by his attorney," Godfrey Johnson, and by Marie Denise Jobin, Vice President of ABC, on July 27, 1971. The trust *627 was established with a contribution of $100. Anglo Dutch, a California corporation, was also a "system entity." Its stock was owned by Harry Margolis and Walter Joe, the latter an employee of Margolis' law corporation (Margolis, Chatzky, Dunnett, and Muehlenbeck) during the years at issue. Anglo Dutch, controlled by Margolis' office, loaned money to clients of Margolis and to business entities which were related to or had dealings with such clients. The principal source of funds for Anglo Dutch was Alms, N.V. (Alms) a Netherlands Antilles corporation organized by A.L.M. In der Rieden. In der Rieden was also a senior employee of CIT. Petitioner's books and records reflect receipt of loans from Anglo Dutch evidenced by notes in the amount of $15,000 on March 20, 1970 and of $25,000 on May 10, 1971. There were four promissory notes in favor of Anglo Dutch, for the signature of Marvin Nelson as president of Bail Bonds, which were issued as follows: March 17, 1970 for $15,000; August 26, 1970 for $5,000 (with a notation that it "Replaces" the first note); April 26, 1971 for $25,000; and April 26, 1972 for $25,000 (with a notation that it renews the April 26, 1971 note), all stating *628 a 10 percent interest rate. The March 1970 and April 1971 notes are stamped "CANCELLED"; the August 1970 and April 1972 notes are stamped "PAID" as of February 19, 1971 and December 26, 1973, respectively. The August 1970 note for $15,000 was unsigned; all the other notes were signed by Nelson, as president of petitioner. There is a dependent interrelationship between the loans received by petitioner from Anglo Dutch and petitioner's payments of reinsurance premiums to Farila and the parties have so agreed. Petitioner used these loan proceeds to transfer funds to Farila; $19,019.43 was so transferred on March 20, 1970 and $26,403.55 on May 12, 1971. The money that was transferred to Farila, ostensibly as payments on the Reinsurance Agreement, then moved back to Nelson and to Anglo Dutch. The following table summarizes these transfers by date: Date
3/17/70
$15,000 note from petitioner to Anglo Dutch is
executed.
3/20/70
Loan payable to Anglo Dutch for $15,000 is entered in
petitioner's books.
3/20/70
Check from petitioner to Farila in the amount of
$19,019.43.
3/20/70
Petitioner enters into its books the payment ot Farila.
4/26/71
$25,000 note from petitioner to Anglo Dutch is
executed.
5/10/71
Loan payable to Anglo Dutch for $25,000 is entered in
petitioner's books.
5/12/71
Check from petitioner to Farila in the amount of
$26,403.55.
5/12/71
Petitioner enters into its books the payment to Farila.
*629 The $19,019.43 check paid by petitioner to Farila on March 20, 1970 was, on March 26, 1970, deposited into Farila's bank account at Banco Popular in Curacao, Netherlands Antilles. On April 2, 1970 Farila transferred $28,897.65 from that account to the Wells and Chesney trust account at the Berkeley branch of the Central Valley National Bank, Berkeley, California. On April 10, 1970, the Wells and Chesney trust account disbursed three checks to Nelson personally, in the total amount of $25,397.65. On the same date, a check from the same Wells and Chesney trust account was drawn for $3,500 to Wells and Chesney in repayment of a loan to Nelson. Thus, the entire $28,897.65 was paid out to or for Nelson. According to Wells, Jr., this April 2, 1970 transfer of $28,897.65 from Farila was a loan from Farila to Nelson made in response to his letter of March 20, 1970 to Farila. The letter stated that "the sums on deposit at Barclay's as of December 31, 1969 are $28,897.65 for Nelson as an individual and $9,685.25 for the corporation" and requested that $28,897.65 be made available to Nelson "pursuant to the terms of the agreement." The reference to Barclay's was intended by Wells, Jr. *630 , to refer to monies held in a reserve account which Nelson or petitioner was purportedly required to maintain at Barclay's Bank with one of their surety companies. For the fiscal year 1970, petitioner's books show that reserve account payments were made to the First Valley Bank for a surety other than Farila. There was no evidence presented for the record to show that petitioner or Nelson ever maintained a reserve account at Barclay's Bank. There was no promissory note evidencing any loan from Farila to Nelson, nor could Nelson recall ever receiving a loan from Farila or ever repaying such a loan. The second transfer of funds petitioner made to Farila circulated back to Anglo Dutch. On May 12, 1971, petitioner paid for a cable transfer of $26,403.55 to Farila. This check was deposited in Farila's bank account at Banco Popular on May 18, 1971. On the same day, $25,000 was transferred from Farila's Banco Popular account to the account of Anglo Dutch at Union Bank, Los Angeles, California. The latter transfer did not affect the balance in any bank account of either petitioner or Nelson. Repayment of the first loan from Anglo Dutch, the one for $15,000, was made by petitioner *631 in three $5,000 installments on June 10, 1970, August 25, 1970, and February 3, 1971. Repayment of the second loan from Anglo Dutch, the one for $25,000, was repaid by means of an elaborate money movement arranged by the Margolis office. In 1973, two bank accounts were opened in the name of petitioner at Barclays Bank in Saratoga, California. On November 3, 1973, account number 00020-16963 (hereinafter "16963") was opened with a deposit of $100 advanced by the Margolis office. Nelson and Adolphson [16] had signature authority over the account. On December 5, 1973 account number 00020-10161 (hereinafter "10161') was opened with a $100 deposit from the Margolis office, Nelson and Adolphson again having signature authority. The $100 used to open each account was recorded on petitioner's books as a loan from "Harry Margolis, a Prof. Corp." On December 26, 1973 a check for $27,000 was written on account 16963 payable to Bail Bonds, signed by Nelson, and deposited in account 10161.At this point in time, petitioner's check record for account 16963 reflected a negative account balance ("-$27,000"). On that same date, two checks were drawn on account 10161--one check for $26,693 payable *632 to Anglo Dutch and another for $300 payable to Harry Margolis for legal fees. On the following day, December 27, 1973, a check for $27,000 was deposited into account 16963. The source of funds for this deposit is not shown on either petitioner's records or the bank account records. Nor do petitioner's books and records reflect an increase in loans payable for this transaction. [17] However, the "system account" maintained by the Margolis office for ABC shows a loan of $27,000 to Marvin Nelson on this date. Nelson, however, was unable to recall a loan transaction with ABC or dealing with a trust account at ABC. No evidence was submitted to show that this amount was ever repaid to ABC. On February 4, 1974, a check for $100 was written on each account payable to Margolis, and both account 16963 and account 10161 were closed. At trial, Nelson was unable to testify regarding these bank accounts, why they were *633 opened, why Adolphson was authorized to sign checks on the account, the purpose of the checks described above, or the origin of the funds in the accounts. Nelson could not recall ever receiving a loan from ABC or ever repaying such a loan. There was no promissory note introduced to evidence such loan. At the second trial, Nelson recalled that he transferred some money to a foreign trust set up by Wells, Jr. and Margolis. However, he did not recall when this occurred, nor how much he placed into the trust. There is no other evidence of record regarding the amount of property contributed to this trust, the transactions engaged in by ABC as trustee thereof, or any distributions made by the trust. Nelson was also unable to explain the purpose of borrowing from Anglo Dutch or why, in general, he included petitioner in the various transactions here at issue, including the Reinsurance Agreement with Farila. Nelson relied upon his attorneys, Wells and Margolis, to arrange the business dealings in which petitioner engaged, with the exception of the bail bond procedures and transactions themselves. Evidence regarding the transfers of funds described above comes from various sources, *634 both testimonial and documentary. While the information contained in the documents is consistent in many respects, there are some notable differences and inconsistencies. There are discrepancies in the dates on which transactions are recorded. These, however, are mostly insignificant in time and can be accounted for by considering the hiatus between the initiation of a money transfer by one party and the receipt and recording of it by another. [18] In some instances, however, there are differences between amounts recorded by different parties, and the sources of funds. A substantial discrepancy exists in the recordation of transactions with Farila. On its fiscal year ending June 30, 1970 return, petitioner claimed a deduction of $46,172.25 for "Fees for Bail Insurance Contracts." This amount is based on a single payment of $19,019.43 to Farila and several payments totaling $27,152.82 to petitioner's general bonding agent. Respondent disallowed the deduction for bail bond insurance to the extent of the $19,019.43 paid to Farila on March 20, 1970. *635 However, the Farila "system account" reflects an additional payment of $12,395.76 on January 27, 1970 by Nelson to Farila. The record in this case does not reveal how the additional $12,395.76 was paid into the "system", and petitioner's records do not account for this payment. There is no support in this record for a finding that an additional $12,395.76 was ever transferred from petitioner or Nelson to Farila. Ultimate Findings of Fact The Reinsurance Agreement between Bail Bonds and Farila lacked substance and generally was ignored by both parties. Payments ostensibly made to Farila by Bail Bonds for premiums under that Agreement are not deductible for federal tax purposes. The funds obtained from Anglo Dutch to make these premium payments were not valid loans creating obligations to pay deductible interest; in each instance these funds ultimately were returned without consideration to Anglo Dutch or to Nelson, personally. In connection with the foregoing, petitioner relied on the advice of attorneys Margolis and Wells, Jr.; Nelson, the president and sole stockholder of Bail Bonds, was unsophisticated in tax matters. OPINION Petitioner claims that its Reinsurance Agreement *636 with Farila was valid and that the payments of $19,019.43 in 1970 and $26,434.05 in 1971 were required to be made under the terms of that contract and, hence, constituted ordinary and necessary business expenses. Petitioner maintains that those amounts were properly accounted for on its books and records and that the difference between the 20 percent of premium income required to be paid to Farila and the lesser amount actually paid was, in fact, a "premium adjustment" offset by Farila's nonpayment of losses and expenses. Thus, petitioner explains the apparent failure of the contracting parties to enforce the agreement as an offset, leaving them nearly in the same position as if the contract had been followed, with an amount owing to petitioner for the difference. Further, it is petitioner's position that the loan arrangement with Anglo Dutch was valid and enforceable. As such, it maintains that the interest claimed to have been paid ($50 in 1970, $1,110.52 in 1971, and $2,500 in 1973) is deductible. Respondent, on the other hand, would have us consider all of petitioner's transactions with "system entities" to be shams. Respondent's position is that petitioner did not deal *637 at arm's length with any of these entities (Anglo Dutch, Farila, or ABC). Rather, it dealt with the "system" as a whole, with Margolis' office creating the facade of actual business transactions among these various entities by preparing documentation having the appearance of negotiated agreements and by manipulating the movement of money among them. Respondent maintains that petitioner had no actual obligation to make any payments to Farila or Anglo Dutch so long as it had a balance of money "paid in" to the system as a whole. Therefore, respondent concludes, none of the expenses claimed to have been incurred were ordinary and necessary business expenses or interest actually "paid," hence, they are not deductible. Alternatively, respondent contends that if we determine that these expenses are deductible, the amount deducted as forfeitures and skip-tracing expenditures are not deductible since these amounts were reimbursable expenditures under the Reinsurance Agreement with Farila. Because we hold in favor of respondent on his original argument, we need not address his alternative position. Petitioner entered into two loan arrangements with Anglo Dutch. [19] The first occurred *638 on March 20, 1970, when petitioner borrowed $15,000; these proceeds were used to make up part of the $19,019.43 premium payment to Farila on March 26. The second loan occurred on May 10, 1971, when petitioner borrowed $25,000 from Anglo Dutch; these proceeds were used to make up part of the $26,403.55 premium payment to Farila on May 12. Because of the direct relation between petitioner's loans from Anglo Dutch and petitioner's payments to Farila, the validity of the loan arrangements (and, hence, the deductibility of the interest payments thereunder) will depend on the validity of the Reinsurance Agreement; [20] i.e., if the agreement is for a legitimate business purpose, so too should be the method of financing the premium payments. If, however, the Reinsurance Agreement lacks economic substance, the loan will also be tainted. Accordingly, we will first focus our discussion on the arguments that relate to the Reinsurance Agreement. *639 Petitioner bears the burden of establishing the validity of its claimed deductions ( Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a)), even when the challenge goes to the substance of the transaction. [21] In this case respondent concedes that petitioner has made payments to Farila, but respondent questions the underlying purpose of those payments. Petitioner contends that its purpose in contracting with Farila was to obtain insurance on the bail bonds it had written, thereby limiting its exposure to the subsequent forfeitures; ostensibly, this is the purpose of the agreement. However, this contention is not supported by the facts as revealed at the trial. *640 It is a well-established principle of tax law that a party has the right to arrange his affairs to reduce the amount of his tax liability; but it is equally well-established that the substance of a transaction must govern its tax consequences regardless of the form in which the transaction is cast. Gregory v. Helvering,293 U.S. 465 (1935). In applying these two principles to a particular factual problem, the test to be used is not whether the motive or intent of the taxpayer on entering into the transaction was, partially or solely, to decrease or avoid his taxes, but is "whether what was done, apart from the tax motive, was the thing which the statute intended." Knetsch v. United States,364 U.S. 361 (1960) (quoting Gregory V. Helvering,supra at 469). Section 162 allows a deduction for the ordinary and necessary expenses, reasonable in amount, incurred in the conduct of a business. United States v. Haskel Engineering & Supply Co.,380 F.2d 786 (9th Cir. 1967). However, the mere fact that a party is legally bound to make a payment is not determinative of the deductibility question. B. Forman Co., Inc. v. Commissioner,453 F.2d 1144 (2d Cir. 1972), *641 modifying 54 T.C. 912 (1970), cert. denied 407 U.S. 934 (1972); The Atlantic Monthly Co. v. Commissioner,5 T.C. 1025 (1945). Nor is the fact that the appropriate book entries were made controlling. Glasgow Village Development Corp. v. Commissioner,36 T.C. 691 (1961); Yant Construction Co. v. Commissioner, a Memorandum Opinion of this Court dated October 27, 1950. "The payment in question is to be judged in light of all the terms and conditions of the agreement establishing the obligation to pay and all the facts and circumstances existing at the time the agreement was made." B. Forman Co., Inc. v. Commissioner,453 F.2d at 1160. In 1969, Nelson approached his attorney, Wells, Jr., for the purpose of incorporating his bail bonds business. At about that same time, Nelson, through Wells, Jr., sought the tax planning services of Margolis. Part of the tax plan developed by Margolis included the execution of the Reinsurance Agreement. Petitioner asserts that this agreement was designed to insulate it from forfeiture losses. Assuming that there was a tax motive leading to the execution of the agreement *642 but disregarding that motive for now, we must look to the terms of agreement, the manner in which those terms were carried out, the circumstances surrounding its execution, and the interrelationship of the parties to determine if the result is that for which section 162 allows a deduction. On its face, the Reinsurance Agreement purported to achieve petitioner's objective--shifting the risk of forfeiture from petitioner to Farila. However, when we consider the circumstances surrounding the Agreement and the treatment of the transaction by the parties, it becomes apparent that the Agreement was mere camouflage designed to disguise a scheme of creating deductions by shifting money back and forth from one party to another through various intermediaries, all of which acted under the effective control or direction of Margolis. As noted previously, although a "taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation." Zmuda v. Commissioner,731 F.2d 1417, 1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982). *643 Looking first at the treatment of the Reinsurance Agreement by petitioner and Farila, we note that virtually all of the significant terms were not carried out. Petitioner's premium payments to Farila were determined arbitrarily, without regard to the formula stated in the Agreement, and were not made within the due dates provided for in the Agreement. Petitioner failed to comply with the condition precedent that it provide a "statement of charges on bonds written" to Farila. As a result, Farila's liability to pay petitioner's forfeiture losses was never effectuated. Petitioner also failed to notify Farila of the forfeiture losses and skip-tracing expenses incurred. Petitioner attempted to explain this last failure by adverting to a letter from Wells, Jr. to Farila which stated that petitioner had "not bothered [Farila] with forfeitures not exceeding $5,000.00." However, Nelson testified that most of the bonds written by petitioner were in amounts less than $5,000. If the purpose of the Agreement was truly to protect against petitioner's exposure to forfeiture, then certainly the area of greatest risk was disregarded by petitioner. Furthermore, during the period petitioner *644 was purportedly covered by the Farila contract, petitioner continued its policies with other surety companies. Petitioner never filed a bona fide claim against Farila, and Farila never reimbursed petitioner for any forfeiture losses or expenses incurred. [22] Thus, in exchange for the payments to Farila, petitioner received nothing in return. In sum, then, it appears that other than alleged premium payments to Farila, nothing of substance called for in the Agreement actually occurred. As clearly indicated by these facts, petitioner acted as though it had never entered into the Reinsurance Agreement. By tracing the flow *645 of funds after payments were made to Farila, we can more readily discern what was actually accomplished by the parties involved. On March 20, 1970, petitioner borrowed $15,000 from Anglo Dutch. On March 26, petitioner paid a premium of $19,019.43 to Farila. On April 2, Farila transferred $28,897.65 to the Wells and Chesney Trust Account at Banco Popular. This entire trust account balance was then disbursed, $25,397.65 going directly to Nelson and $3,500 to Wells and Chesney as repayment of a debt by Nelson. Petitioner could not explain the purpose of the transfer from Wells & Chesney to Nelson. We find that the only adequate explanation is that this was part of the pre-arranged transfer of funds designed to produce a corporate level deduction for petitioner with the monies transferred ending up in the hands of its sole shareholder. Thus, the monies were merely passed from one participant in the Margolis system to another. On May 10, 1971, petitioner borrowed $25,000 from Anglo Dutch. On May 12, petitioner paid a premium of $26,403.55 to Farila. On May 18, Farila then transferred $25,000 to Anglo Dutch. Thus, the monies traveled in a circle and petitioner has shown no purpose *646 for this circuitous transfer. Petitioner's loan from Anglo Dutch was repaid in 1973 with the proceeds of a loan from ABC to Nelson; however, the loan from ABC did not appear on the books of Nelson or petitioner nor was any evidence of such a loan introduced.The loan simply disappeared, and Nelson could not recall ever arranging or receiving any loan from ABC. Another fact which leads us to question the validity of the Reinsurance Agreement is petitioner's inability to explain how the parties arrived at the requirement stated in the Agreement of a premium payment of 20 percent of gross revenue. With the advantages of hindsight, we can now see that payments based on this amount would be well in excess of petitioner's loss exposure for the years 1969-1974. We do not have records for prior years to show whether this percentage may have been based on the history of the sole proprietorship's losses. It is clear, however, that neither Nelson, nor anyone in his office, nor Wells, Jr. questioned the adoption of this 20 percent figure. We find the blind acceptance of this percentage to be understandable when we consider, first that whatever amount was inserted in the agreement was of *647 no real consequence because any amount paid would merely circulate from Farila back to petitioner's sole shareholder or to ABC, which supplied the largest portion of the payments, and, second, that the 20 percent figure, although stated in the Agreement, was completely disregarded by petitioner in determining the actual payments, arbitrarily made. It is apparent that petitioner's transactions with Farila "did not appreciably affect [its] beneficial interest except to reduce [its] tax." Knetsch v. United States,364 U.S. at 366, quoting from Gilbert v. Commissioner,248 F.2d 399, 411 (2d Cir. 1957) (dissenting opinion). Clearly, there was nothing of substance to be realized by petitioner from this transaction other than a tax deduction. We are further persuaded that these transactions are without substance when we consider the manner in which they were arranged. Without restating the relationship between the parties, which is fully described in the findings of facts, suffice it to say that the linchpin in this arrangement was Margolis and the Margolis office. Neither petitioner nor Nelson previously had dealt with or had known of Anglo Dutch, *648 Farila, or ABC. However, through the Margolis Office, petitioner became an active participant in this system.The Margolis office owned and controlled Anglo Dutch and exercised effective control over Farila and ABC. It was Margolis' office which drafted most of the provisions of the Reinsurance Agreement, and his office arranged petitioner's own transactions in this case down to the minute details of providing petitioner's bookkeeper with the appropriate book entries and monitoring the movement of funds among the parties. It is clear, therefore, that the transactions here involved were part of an elaborate, well-orchestrated and pre-arranged money movement, the sole purpose of which was to create the substantiation needed to support the deductions claimed. [23] This is not a sufficient base on which to support a business expense deduction. Knetsch v. United States,supra;Audano v. United States,428 F.2d 251 (5th Cir. 1979). Hence, petitioner may not deduct the payments made on the Reinsurance Agreement. *649 Petitioner argues alternatively that if the agreement with Farila is held invalid, petitioner should be entitled to deduct the "net unrecovered payment made by petitioner to Farila." It would appear that petitioner computes this amount as the amount of its actual forfeiture losses, court costs, and skip-tracing expenses, less the "credits" (see footnote 21, supra) given by Farila against premiums not paid. As support for its position, petitioner cites Protzmann v. Commissioner,276 F.2d 684 (1st Cir. 1960), vacating and remanding a Memorandum Opinion of this Court, which stands for the proposition that when a claim is disputed and a settlement is made, the amount not recovered is allowable as a loss. Petitioner's reliance on Protzmann is misplaced. The taxpayer in that case entered into a bona fide business transaction, and the loss incurred resulted from this transaction. By contrast, petitioner's transactions with Farila are shams. The consequence of this finding is that, in an economic sense, there was no agreement with Farila; hence, the payments to Farila and "credits" from Farila are not recognized for tax purposes. Accordingly, these amounts *650 are neither deductible nor includable by petitioner. There was no real loss or expense; therefore, petitioner may not deduct any "net unrecovered payment." Since the Reinsurance Agreement with Farila is without substance, we find that the loans from Anglo Dutch are also lacking in substance. Petitioner, however, contends that because the form of the loan agreements was proper, these transactions should be valid. We do not agree.We must look to the entire transaction to see if it achieves the purpose that the statute intended. Knetsch v. United States,supra.These loans were obtained for the purpose of financing the Reinsurance Agreement, and proceeds merely circulated through various intermediaries as part of the scheme to create expense deductions for petitioner and to funnel cash into the hands of its sole shareholder. [24] Thus, the substance of these transactions is inextricably linked to the Reinsurance Agreement. We, therefore, find the loans to be without economic substance. Hence, petitioner may not deduct any amount paid as interest to Anglo Dutch. *651 Additions to Tax under Section 6653(a)
We consider, finally, whether petitioner acted negligently or with intentional disregard of the rules and regulations in claiming the deduction disallowed herein. Petitioner has the burden of proving that respondent's imposition of the addition to tax under section 6653(a) is erroneous. Enoch v. Commissioner,57 T.C. 781 (1972). Petitioner must show that it "made reasonable inquiry" as to the income tax validity of its actions. Zmuda v. Commissioner,79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). The record in this case establishes the fact that petitioner relied on its attorneys, Wells, Jr., and Margolis, to implement the tax planning here involved. Wells, Sr., prepared petitioner's tax returns for some of the years at issue. Further, much of the information entered into the books and records of petitioner by the bookkeepers was supplied by these individuals. Under these particular circumstances, petitioner's reasonable reliance on counsel does excuse it from liability for the addition to tax under section 6653(a). Hill v. Commissioner,63 T.C. 225 (1974), *652 affd. 551 F.2d 313 (9th Cir. 1977), without published opinion. In asserting the additions to tax against petitioner, respondent relied on Bailey v. Commissioner,21 T.C. 678 (1954) and Perrett v. Commissioner,74 T.C. 111 (1980), affd. without published opinion 679 F.2d 900 (9th Cir. 1982); however, those cases are clearly distinguishable from the present case. Bailey involved the negligent failure of the taxpayer to review his return from which a substantial item of income had been omitted by the preparer.The present case, by contrast, does not involve an omission from the return but raises the question of the proper income tax treatment of complex transactions. Perrett involved the imposition of additions for negligence against a tax specialist for engaging in transactions he should have realized lacked substance for tax purposes. In the present case, petitioner was justified in relying solely on the advice of its attorneys and accountant since neither petitioner nor Nelson was a tax expert. Nelson, president and sole stockholder of petitioner, was generally unsophisticated in tax matters and depended implicitly *653 upon his advisors. We think petitioner "made reasonable inquiry" under the facts and circumstances of this case. Respondent is sustained on the reinsurance and the interest expense adjustments but not on the addition to tax under section 6653(a). An appropriate order will be issued.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise noted.↩
2. Petitioner claimed a deduction of $46,172.25 for "Bail Insurance Contracts" for its taxable year ending June 30, 1970, and $26,434 for "Reinsurance Costs" for its taxable year ending June 30, 1971. No similar insurance expense deductions were claimed for 1972 through 1975 (although a small insurance expense deduction was claimed for each year). The reasons given for the disallowances are that it has not↩ been established that: a) the reinsurance transaction should be recognized as bona fide for tax purposes; b) the contract with Farila was valid and enforceable; and c) the amounts claimed as expenses were ordinary and necessary business expenses. 3. Petitioner claimed total interest deductions of $105.92, $1,110.52, and $2,500 for its tax years ending June 30, 1970, 1971, and 1973, respectively. The reasons given for the disallowances are that it has not↩ been established that: a) an indebtedness was incurred; b) the amount claimed was paid or properly accrued; and c) the transaction giving rise to the indebtedness should be recognized for tax purposes.
4. California Insurance Code section 1800 et seq. (West 1972). While it is stipulated that petitioner was incorporated, and there was testimony that the Secretary of the State of California approved petitioner's application for incorporation, California Insurance Code section 1810 (West, 1972) provides that "Only natural persons can be licensed under this chapter." There is no further evidence in the record regarding the incorporation of petitioner (including whether incorporation was sought under the "Professional Corporations" chapter of the Corporation Code of California section 13400, et seq.), any waiver or nonapplication of California Insurance Code section 1810, nor regarding the qualification of petitioner, as opposed to Nelson, personally, as a person licensed to sell bail bonds under California Insurance Code section 1800, et seq. However, petitioner's classification as an association taxed as a corporation for Federal income tax purposes is a function of Federal law, not state law. Section 7701; section 301.7701-1(c), 301. 7701-2, Proced. and Admin. Regs. Therefore, petitioner's qualification, vel non, under California Insurance Code section 1800 will not affect our treatment of it as an association taxed as a corporation in this case. See Kintner v. Commissioner,216 F.2d 418↩ (9th Cir. 1954).
5. Petitioner should have cited our Rules 31(b) and 41(a) to the same effect.↩
6. A copy of which will be attached to the record herein.↩
7. It is procedurally proper to plead avoidance or an affirmative defense such as collateral estoppel. Rule 39.↩
8. See Horstmier v. Commissioner,T.C. Memo. 1983-409. Compare C.F. Malanka and Sons, Inc. v. Commissioner,T.C. Memo. 1979-187, affd. without published opinion 661 F.2d 913 (3d Cir. 1981), wherein we took judicial notice of a state court proceeding and certain ultimate facts determined therein, but not of disputable "adjudicative facts," citing Rule 201 of the Federal Rules of Evidence. The questions which need to be determined here were not at issue in the cases decided in the California Superior Court, nor confronted by this Court in the dismissed Anglo Dutch↩ dockets.
9. We consider this to be a stipulation of testimony, thus we will apply the standards of Rule 91 to petitioner's current objection to its admission.↩
10. We do not find that the parties actually agreed to relinquish any benefit gained through the original stipulation. Therefore, we do not consider them to have agreed to change the stipulations, as such. Rule 91(e) does permit change in a stipulation by agreement of the parties. See the effect of the comparable Rule 36, Federal Rules of Civil Procedure, in Mangan v. Broderick and Bascom Rope Company,351 F.2d 24↩ (7th Cir. 1965).
11. Various terms used herein are for descriptive purposes only and are not intended to convey legal characterizations the sufficiency of which are in issue here, viz interest, loan, expense, etc.↩
12. Margolis was not a shareholder, officer, or director of any these companies. Employees of CIT filled these positions and capacities.↩
13. Compare Karme v. Commissioner,73 T.C. 1163, 1173-1175 (1980), affd. 673 F.2d 1062↩ (9th Cir. 1982).
14. The testimony at trial referred to a client's "credit" or "debit" to the system for amounts paid in and paid out. We do not use these terms, however, because, as the system accounting itself demonstrates, they were not "debits" and "credits" in the traditional accounting sense, and our use of them could create ambiguity or confusion.↩
15. Petitioner incurred a cable transfer fee of $30.50 on this transaction; petitioner deducted both this fee and the payment to Farila (totaling $26,434.05) as Reinsurance Costs on its taxable year 1970 return.↩
16. A CPA employed by the Margolis law firm. ↩
17. Although petitioner kept its books for tax and accounting purposes on the cash receipts and disbursements basis, it did maintain a separate account entitled Loans Payable in which borrowing transactions were recorded.↩
18. However, the dates shown by our findings are significant to the year of the inclusion of a transaction in a particular tax year.↩
19. Petitioner executed two additional promissory notes evidencing loans with Anglo Dutch on August 26, 1970 for $5,000 and on April 26, 1972 for $25,000. These loans, however, are merely extensions of a portion of the original principal borrowed in the transactions on March 17, 1970 and on April 26, 1971. Therefore, we will treat these extensions as part of the original borrowings rather than as separate loan transactions.↩
20. Thompson v. Commissioner,66 T.C. 1024, 1053 (1976), affd. 631 F.2d 642↩ (9th Cir. 1980).
21. On brief, however, petitioner contends that the presumption of correctness usually attached to respondent's determination of a deficiency should not apply in this case because to do so would require that petitioner prove a negative, i.e., that the transactions in question were not shams. In support of this contention, petitioner relies on Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). In that case, the Commissioner's determination of a deficiency in the taxpayer's income was based on unreported income from the sale of narcotics. The Ninth Circuit held that the Commissioner must offer "some substantive evidence showing that the taxpayer received income from the charged activity" and, hence, could not rely solely on the presumption of correctness. But where, as in this case, respondent questions the deductibility of an expense, the taxpayer retains the burden of proof. Karme v. Commissioner, 673 F.2d at 1065, affg. 73 T.C. 1163 (1980). In addition, respondent in this cases has presented substantial evidence in support of his determination, evidence which challenges the documentary framework of the transaction, establishes the factual background against which the transactions occurred, and traces the flow of funds among the parties. Thus, the factual situation is entirely different from Weimerskirch.↩ The presumption of correctness, therefore, remains.
22. Petitioner contends that Farila did reimburse petitioner for losses--not by sending a reimbursement check, as provided for in the agreement, but by allowing credit against premiums due in subsequent years. However, petitioner failed to submit any evidence that such a credit was given by Farila or that petitioner took such a credit into account in determining future payments under the contract. Additionally, there is nothing in the record of this case that a claim was ever asserted by petitioner against Farila for the alleged "balance owed" of $4,786.86.↩
23. Additionally, we note that the risk of loss here had not been effectively shifted. Compare Humana Inc. and Subsidiaries v. Commissioner,T.C. Memo. 1985-426↩, and cases cited therein.
24. In Saviano v. Commissioner,765 F.2d 643 (7th Cir. 1985), affg. 80 T.C. 955↩ (1983), the 7th Circuit stated: "The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future."