**BAIL BONDS BY MARVIN NELSON, INC., a corporation,**
Petitioner-Appellant,

v.

**COMMISSIONER OF the INTERNAL REVENUE SERVICE,**
Respondent-Appellee.

No. 86–7519.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 15, 1987.

Decided July 8, 1987.

Ondrej Kojnok, San Jose, Cal., for petitioner-appellant.

Roger M. Olsen, Michael L. Paup, Robert A. Bernstein, Nancy G. Morgan, Washington, D.C., for respondent-appellee.

Before CHOY, Senior Circuit Judge, GOODWIN and TANG, Circuit Judges.

CHOY, Senior Circuit Judge:

Bail Bonds by Marvin Nelson, Inc., appeals the tax court's decision upholding the denial by the Commissioner of the Internal Revenue Service of certain tax deductions. We affirm.

## BACKGROUND [1]

Marvin Nelson was a bail bondsman licensed in the state of California. In 1969, Nelson became a tax planning client of Harry Margolis. Under Margolis' guidance, Nelson's business was incorporated as Bail Bonds by Marvin Nelson, Inc. ("Bail Bonds"). Nelson was Bail Bonds' sole shareholder and president during the years at issue.

In devising tax planning for his clients, Margolis arranged a variety of transactions between entities controlled by or under the effective control of Margolis, and entities (such as Bail Bonds) set up by Margolis' clients. The Margolis organization referred to these entities as "system entities" because of their involvement with the Margolis tax planning "system."

Transactions between Margolis' clients and the system entities were recorded in a "system account." The account was an informal record of money paid into the system by the client, transactions undertaken with that money by the system entities, and money paid out of the system to the client. A "circulating" transaction occurred when funds were passed among system entities, with no money coming into or going out of the system.

### I. *Farila and Anglo Dutch Transactions*

On May 11, 1969, Nelson executed a reinsurance agreement with Farila, N.V., a Netherlands Antilles corporation, whereby Farila purportedly undertook to become secondarily liable for Bail Bonds' losses arising from bail bond forfeitures.[2] Farila was a system entity effectively controlled by Margolis. As it turned out, Farila never actually reimbursed Bail Bonds for any forfeitures incurred by Bail Bonds.

Bail Bonds made two premium payments to Farila: 1) $19,019.43 on March 20, 1970, and 2) $26,403.55 on May 12, 1971. In order to make the premium payments, Bail Bonds obtained two loans from Anglo Dutch Capital Corporation ("Anglo Dutch"). Anglo Dutch, a California corporation, was a system entity directly controlled by Margolis. The loans were as follows: 1) $15,000 on March 20, 1970, and 2) $25,000 on May 10, 1971. Bail Bonds issued promissory notes to Anglo Dutch, all stating a ten percent interest rate.

The proceeds of the $15,000 loan were in essence transferred from Bail Bonds to Farila and then shortly thereafter transferred to Nelson personally.[3] The tax court characterized the transfer as "part of the pre-arranged transfer of funds designed to produce a corporate level deduction for [Bail Bonds] with the monies transferred ending up in the hands of [Nelson]." The loan was apparently paid off in three installments to Anglo Dutch in 1970–71.

The proceeds from the $25,000 loan were circulated in the space of a few days as follows: 1) $25,000 loan entered in Bail Bonds' books; 2) $26,403.55 check issued by Bail Bonds to Farila as a premium payment; 3) $26,403.55 check deposited in Farila's bank account; 4) $25,000 transferred from Farila's bank account to Anglo Dutch's bank account. Thus, the $25,000 loan from Anglo Dutch circulated right back into Anglo Dutch's hands.

---

1. What follows is a brief summary of the complex transactions at issue here. A more complete description of these events can be found in the tax court's opinion, published at 51 T.C.M. (CCH) 294 (1986).

2. Generally, an insurance company acts as a surety on the bonds posted by a bail bondsman. During the years at issue, Nelson had contracts with insurance companies (apart from Farila) to act as sureties on bonds written by Nelson. Farila agreed to become secondarily liable if another insurance company under contract to Bail Bonds would not pay under a bond or if Bail Bonds became liable for a bond forfeiture.

3. More specifically, on March 20, 1970, Bail Bonds borrowed $15,000 from Anglo Dutch. On that same date, Bail Bonds paid a $19,019.43 premium to Farila. On April 2, Farila transferred $28,897.65 to a Wells & Chesney trust account. (Wells & Chesney was a law firm which represented Nelson.) The entire trust account was disbursed on April 10, with $25,397.65 going directly to Nelson; the rest was used to repay a loan made by Wells & Chesney to Nelson. At trial, Bail Bonds was unable to explain the purpose of the transfer from Wells & Chesney to Nelson.

A separate money transfer was arranged in order for Bail Bonds to pay off the $25,000 Anglo Dutch loan. In late 1973, two bank accounts were set up in the name of Bail Bonds: account number 00020–16963 ("account 16963") and account number 00020–10161 ("account 10161").[4] Each account was opened with a $100 deposit advanced by the Margolis office. On December 26, 1973, a check for $27,000—payable to Bail Bonds and signed by Nelson—was written on account 16963. At that time the account contained only $100. The check was deposited in account 10161. On the same day, a check for $26,693 payable to Anglo Dutch was drawn on account 10161. This amount served to pay off the $25,000 Anglo Dutch loan. On December 27, this series of transactions was belatedly funded by the deposit of a $27,000 check into account 16963. The source of these funds is not reflected in Bail Bonds' records. However, the system account maintained by the Margolis office for a system entity called Aruba Bonaire Curacao Trust Co., Ltd. ("ABC") shows a $27,000 loan to Nelson on December 27, 1973. Nelson was unable to recall this loan at trial, no promissory notes were introduced at trial to substantiate Nelson's liability for the loan, and no evidence was submitted to show that this loan was repaid to ABC. Thus, it is apparent that the Anglo Dutch loan was paid off by circulating $27,000 from ABC to Anglo Dutch.

On its federal income tax returns for 1970, 1971, and 1973, Bail Bonds deducted the reinsurance payments to Farila and the interest payments to Anglo Dutch. The payments to Farila were deducted as ordinary and necessary business expenses pursuant to I.R.C. § 162(a). The interest payments to Anglo Dutch were deducted pursuant to I.R.C. § 163(a). The Commissioner of the Internal Revenue Service (the "Commissioner") disallowed the deductions. Bail Bonds petitioned the tax court for a redetermination of the deficiencies assessed by the Commissioner.

## II. *Proceedings of the Tax Court*

In 1979, the case was tried in the tax court before Judge William H. Quealy. Af-

ter the case was tried and briefed, but before the findings of fact and law were filed, Judge Quealy retired. The case was reassigned to Special Trial Judge Fred R. Tansill, who granted Bail Bonds' motion for a new trial.

Before the first trial, the parties had jointly moved for an order incorporating into the record the testimony of Alfred Harris, a former Margolis employee, given before the tax court in a previous unrelated case. The tax court granted the motion, treating it as a stipulation. At the second trial, the tax court denied Bail Bonds' request to withdraw the stipulation.

The tax court in the second trial held that the reinsurance agreement with Farila was a sham "designed to disguise a scheme of creating deductions by shifting money back and forth from one party to another through various intermediaries, all of which acted under the effective control or direction of Margolis."

In concluding that the Anglo Dutch loans were also shams, the tax court relied heavily on the sham nature of the Farila agreement. The court stated that "[i]f … the [Farila] Agreement lacks economic substance, the loan will also be tainted." More specifically, the court found that the funds from Anglo Dutch were not valid loans creating obligations to pay deductible interest. The funds instead were ultimately returned without consideration to Anglo Dutch or Nelson. Thus, the court determined that the loan "proceeds merely circulated through various intermediaries as part of the scheme to create expense deductions for [Bail Bonds] and to funnel cash into the hands of [Nelson]." The court concluded that the Anglo Dutch loans did not constitute genuine indebtedness, and sustained the Commissioner's disallowance of the interest deductions.

On appeal, Bail Bonds contends that the tax court's decision contained errors of law in three respects: (1) the judge in the second trial improperly relied on the transcript of the first trial; (2) in the second trial, the tax court improperly enforced the

---

**4.** Nelson and Ronald Adolphson, an accountant employed by the Margolis law firm, had signa-

ture authority over these accounts. The accounts were closed on February 4, 1974.

stipulation regarding the testimony of Alfred Harris; and (3) the tax court erroneously upheld the disallowance of Bail Bonds' interest deductions for the Anglo Dutch loans.

## DISCUSSION

### I. *Second Trial Judge's Reliance on Transcript of First Trial*

■ Bail Bonds argues that the trial judge in the second trial erred as a matter of law by reading the transcript from the first trial and relying on the transcript in rendering his decision. Where a judge is unable to complete his or her duties at a trial, a new trial ordinarily must be held if no findings of fact and conclusions of law have been filed. *See Townsend v. Gray Line Bus Co.*, 767 F.2d 11, 17–18 (1st Cir. 1985). Thus, it would be improper if, as Bail Bonds alleges, the tax court used the transcript of the first trial to dispose of the case. However, Bail Bonds has provided no evidence that the tax court simply used the prior transcript to decide the case. Rather, it appears that the court admitted parts of the transcript from the first trial, with reference to the relevant evidentiary rules.[5]

■ The trial court's admission into evidence of parts of the prior trial's transcript is reviewed for abuse of discretion. *See Arrow-Hart, Inc. v. Philip Carey Co.*, 552 F.2d 711, 713 (6th Cir.1977). There is no indication in the record that the tax court abused its discretion in this case. Specifically, there is no indication that the tax court's admission of parts of the first trial's transcript was in violation of the applicable rules of evidence. *See generally Azalea Fleet, Inc. v. Dreyfus Supply & Machinery Corp.*, 782 F.2d 1455, 1460–61 (8th Cir.1986) (prior trial testimony admissible if in compliance with relevant evidentiary rules).

### II. *Stipulation From First Trial*

Bail Bonds contends that, in the second trial, the tax court erred in enforcing the stipulation regarding the Harris testimony entered into during the first trial. Stipulations to the tax court are governed by Rule 91 of the Tax Court Rules of Practice and Procedure. Rule 91(e) states that: "The [Tax] Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires."

■ Bail Bonds argues that, as a matter of law, a stipulation entered prior to the first trial of a case does not apply to the de novo retrial of that case. Bail Bonds cites no authority for this proposition. On the contrary, a number of cases have held that, on retrial of a case, stipulations entered pursuant to the first trial of that case may remain in effect. *See United States v. Boothman*, 654 F.2d 700, 703 (10th Cir. 1981); *United States v. Marino*, 617 F.2d 76, 82 (5th Cir.), *cert. denied*, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474 (1980); *Mittlieder v. Chicago & Northwestern Railway Co.*, 441 F.2d 52, 55 (8th Cir.1971); *but cf. Meehan v. Central Railroad Co. of New Jersey*, 181 F.Supp. 594, 628 n. 19 (S.D.N.Y.1960) (on retrial, stipulation "would not necessarily survive the original trial"). We conclude that the tax court in the instant case correctly treated the Harris stipulation in the same manner as a stipulation used during the single trial of a case.

■ The tax court's decision to enforce a stipulation is reviewed for abuse of discretion. *See Boothman*, 654 F.2d at 703. A stipulation will generally be enforced unless manifest injustice would result. *See* Rule 91(e), Tax Court Rules of Practice and Procedure (tax court may permit a party to change stipulation where justice requires); *see also Vallejos v. C.E. Glass Co.*, 583 F.2d 507, 511 (10th Cir.1978) ("manifest injustice" rule); *Jeffries v.*

---

5. The prior testimony of Nelson was offered by the Commissioner as an admission by a party opponent. *See* Fed.R.Evid. 801(d)(2). The prior testimony of Arthur Wells, Jr. (Nelson's attorney) and Walter Joe (a Margolis associate) was offered by the Commissioner as former testimony admissible because the declarants were "unavailable" due to lack of memory. *See* Fed.R. Evid. 804(a)(3); 804(b)(1).

*United States,* 477 F.2d 52, 55 (9th Cir. 1973) (same). Bail Bonds has not shown that manifest injustice resulted from the tax court's decision to enforce the stipulation; that decision was well within the court's discretion. The tax court correctly found unpersuasive Bail Bonds' claim that enforcement of the stipulation would unfairly deny it the right to confront and cross-examine Harris. The same situation existed when Bail Bonds first entered into the stipulation, and nothing subsequently occurred to change the effect of the original stipulation.

### III. *Deductibility of Interest on the Anglo Dutch Loans*

Bail Bonds contends that the tax court erred as a matter of law in upholding the Commissioner's denial of the deduction for the interest on the Anglo Dutch loans. Bail Bonds does not appeal the determination that the Farila transactions were shams; rather, it argues that the Anglo Dutch loans were not shams. Bail Bonds claims that it borrowed money from Anglo Dutch, was legally obligated to repay it, and did in fact repay it with interest. Bail Bonds concludes that the cost of the use of funds in this transaction is deductible. We disagree.

### A. *Standard of Review*

■ The tax court's determination that the Anglo Dutch loans were shams is a finding of fact which will not be overturned on appeal unless it is clearly erroneous. *Karme v. Commissioner,* 673 F.2d 1062, 1065 (9th Cir.1982). The standards of law employed by the tax court in making its sham determination are reviewed de novo. *See United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### B. *Analysis*

■ Pursuant to I.R.C. § 163(a), an income tax deduction may be taken for interest paid on indebtedness. However, interest on sham indebtedness is not deductible. *See, e.g., Goldberg v. United States,* 789 F.2d 1341, 1342–43 (9th Cir.1986); *Beck v.*

*Commissioner,* 678 F.2d 818, 821 (9th Cir. 1982). A transaction is a sham if it has no purpose or economic effect other than the creation of tax deductions. *See Neely v. United States,* 775 F.2d 1092, 1094 (9th Cir.1985); *Zmuda v. Commissioner,* 731 F.2d 1417, 1421 (9th Cir.1984).

■ When the deductibility of interest is at issue, we focus on the substance of the loan transaction rather than its form. *See Knetsch v. United States,* 364 U.S. 361, 365–66, 81 S.Ct. 132, 134–35, 5 L.Ed.2d 128 (1960); *Goldberg,* 789 F.2d at 1343. Where, as here, the Commissioner has made a deficiency determination, the taxpayer has "the burden of producing enough evidence to rebut the deficiency determination and the burden of persuasion in substantiating a claimed deduction." *Valley Title Co. v. Commissioner,* 559 F.2d 1139, 1141 (9th Cir.1977).

### 1. *Rice's Toyota*

In support of its argument that the tax court's decision was an error of law, Bail Bonds relies primarily on *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89 (4th Cir.1985). That case reversed a determination by the tax court that the interest on a recourse debt undertaken to finance a sham sale-leaseback arrangement was not deductible. The tax court had disregarded the transaction in its entirety, effectively determining that the recourse debt was a sham because the underlying sale-leaseback transaction was a sham.

In reversing, the Fourth Circuit stated that the Internal Revenue Code does not limit deductibility of interest depending upon the item purchased by the taxpayer. *Id.* at 96. The court concluded that the sham nature of the sale-leaseback agreement did not support the trial court's conclusion that the recourse loan was not genuine debt. *Id.* Rather, the recourse loan had created a genuine legal obligation on the part of the taxpayer, and possessed sufficient economic substance to justify the taxpayer's interest deductions. *Id.*

■ *Rice's Toyota* is relevant to the case at issue because the court below basi-

cally relied on the sham nature of the underlying Farila transaction in concluding that the Anglo Dutch loans were shams. We read *Rice's Toyota* to hold that, as a factual matter, indebtedness undertaken to fund a sham transaction is not *necessarily* a sham.[6] Consequently, a transaction involving use of loans to fund a tax avoidance scheme cannot be disregarded in its entirety unless the loans themselves have been separately examined and found to be shams.

### 2. *Sham nature of Anglo Dutch loans*

■ In the instant case, the tax court did not err in determining that the loans at issue were shams. The court did not rely simply on the sham nature of the underlying Farila transaction in determining that the Anglo Dutch loans were shams. Rather, it relied on the close relationship, and, more important, the close *similarity* between the Farila and Anglo Dutch transactions, concluding that both transactions occurred only on paper and operated simply to circulate money among various participants in the Margolis system. The court then proceeded to make a separate finding that the loans operated solely to create interest deductions and to circulate funds from Bail Bonds to Nelson.

■ The record does not support Bail Bonds' contention that the Anglo Dutch loans were not shams. In determining whether a transaction is a sham, courts typically focus on two related factors: 1) has the taxpayer shown that it had a business purpose for engaging in the transaction other than tax avoidance? 2) has the taxpayer shown that the transaction had economic substance beyond the creation of tax benefits? *See, e.g., Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84, 98 S.Ct. 1291, 1303, 55 L.Ed.2d 550 (1978); *Zmuda*, 731 F.2d at 1421; *Salley v. Commissioner*, 464 F.2d 479, 482, 485 (5th Cir. 1972); *Hilton v. Commissioner*, 74 T.C. 305, 349–50 (1980), *aff'd per curiam*, 671 F.2d 316 (9th Cir.), *cert. denied*, 459 U.S.

907, 103 S.Ct. 211, 74 L.Ed.2d 168 (1982). The business purpose factor often involves an examination of the subjective factors which motivated a taxpayer to make the transaction at issue. The economic substance factor involves a broader examination of whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction. *See generally Packard v. Commissioner*, 85 T.C. 397, 417 (1985). In the instant case, Bail Bonds has failed to demonstrate that the Anglo Dutch transaction had either a business purpose or economic substance.

It is clear from the record that the $25,000 loan was basically a fictitious transfer which circulated $25,000 from Anglo Dutch to Bail Bonds and back to Anglo Dutch. The loan was then paid off by another fictitious transfer which circulated approximately $27,000 from ABC (a system entity effectively controlled by Margolis) to Bail Bonds and back to Anglo Dutch (a system entity directly controlled by Margolis).

The $25,000 loan was a sham for two related reasons. First, it is clear that the transaction between Bail Bonds and Anglo Dutch was motivated and shaped solely by tax avoidance concerns. Second, because both the loan and the repayment of the loan consisted of nothing more than circulations of funds through the Margolis system, Bail Bonds did not actually secure the use of or pay for the use of the $25,000. *See Karme v. Commissioner*, 73 T.C. 1163, 1186–87 (1980), *aff'd*, 673 F.2d 1062 (9th Cir.1982); *see also Beck*, 678 F.2d at 821 (interest deduction may be taken only where taxpayer pays for the use or forbearance of money); *Norton v. Commissioner*, 474 F.2d 608, 610 (9th Cir.1973) (same). In sum, the $25,000 loan had neither a business purpose nor economic substance. Consequently, the interest on the loan is not deductible. *See Salley*, 464 F.2d at 485.

---

**6.** More generally, the court held that "a sham transaction *may* contain elements whose form reflects economic substance and whose normal tax consequences may not therefore be disregarded." *Rice's Toyota*, 752 F.2d at 96 (emphasis added).

The nature of the $15,000 loan is somewhat less clear. The tax court found that the loan operated to create tax benefits for Bail Bonds and to circulate funds from Bail Bonds to Nelson. But the tax court did not spell out how the loan was repaid, beyond stating that repayment to Anglo Dutch occurred in three installments.

Nevertheless, Bail Bonds has failed to meet its burden of proving that the $15,000 loan was not a sham. *See Goldberg,* 789 F.2d at 1343; *Karme,* 673 F.2d at 1065; *Thompson v. Commissioner,* 66 T.C. 1024, 1052–53 (1976), *aff'd,* 631 F.2d 642 (9th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). Indeed, at trial Nelson testified that he was unable to recall the Anglo Dutch loans. Specifically, as with the $25,000 loan, there is no evidence that Bail Bonds had a business purpose for making the $15,000 loan; the loan was shaped solely by tax avoidance concerns. Nor is there evidence that the loan had economic substance. There is no evidence that Bail Bonds could have benefited economically from the transaction, aside from obtaining tax deductions. *See Rice's Toyota,* 752 F.2d at 94; *Packard,* 85 T.C. at 417. Funds derived from one system entity (Anglo Dutch) were simply designated as a premium payment on a sham reinsurance agreement with another system entity (Farila). In light of Bail Bonds' failure to prove that the $15,000 loan had a business purpose or economic substance, and in light of the close similarity between the Anglo Dutch transactions and the sham Farila transactions, we conclude that the district court's determination that the $15,000 loan was a sham is not clearly erroneous. The interest on the $15,000 loan is not deductible.

Our determination that the interest on both Anglo Dutch loans is not deductible is not affected by Bail Bonds' contention that it had a legal obligation to repay the Anglo Dutch loans. Beyond the bare assertion that it had such an obligation, Bail Bonds has supplied no evidence demonstrating that this obligation was genuine. Rather,

the complete absence of arm's length dealings in the Anglo Dutch transactions indicates that Bail Bonds' purported legal obligation to repay the loans was purely formal. The obligation may therefore be disregarded. *See Goldberg,* 789 F.2d at 1343; *Norton,* 474 F.2d at 610.

## CONCLUSION

The decision of the tax court is AFFIRMED.