# United States Tax Court

T.C. Memo. 2024-9

MICHAEL W. AUBIN AND KERRY A. AUBIN,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 1814-20.                    Filed January 23, 2024.

_____

During 2015, 2016, and 2017, P–H was employed by NG at a defense facility in Australia (Pine Gap). The parties stipulated that, in January 2015, he signed an agreement, included in the record, in which he waived any right to elect under I.R.C. § 911(a) to exclude income he earned at Pine Gap during 2015, 2016, and 2017. DP signed the closing agreement on behalf of TS, then the Acting Assistant Deputy Commissioner (International) of the Internal Revenue Service. TS's duties, as set forth in the description of his position, included the administration of tax treaties and the supervision of subordinates. By file memo and an email exchange with DP, TS authorized DP to act on his behalf during a period that included the date on which DP signed P–H's closing agreement. R has moved for partial summary judgment that P–H's closing agreement is valid. While R's Motion was pending, Ps submitted a Motion in Limine to exclude the closing agreement from evidence, claiming that allegations of forgery in another case involving a Pine Gap employee called into question the reliability of the document which Ps and R stipulated.

*Held*: An allegation of forgery in another case does not, by itself, provide sufficient grounds to justify relieving a taxpayer of a stipulation that he signed a document

**Served 01/23/24**

[*2]    material to the taxpayer's case. Ps are thus bound by their stipulation that P–H signed the closing agreement. *See* Rule 91(e).

*Held, further*, I.R.C. § 7121 governs the enforceability of a closing agreement whether the taxable years it covers end before or after the agreement becomes effective. Statement of Procedural Rules, 26 C.F.R. § 601.202(a)(2).

*Held, further*, because P–H's closing agreement implements a procedure developed by the competent authorities of the United States and Australia acting under the color of Article 24 of the income tax treaty between those countries, the closing agreement had a sufficient nexus to the treaty that the description of TS's position gave him the authority to sign the agreement on R's behalf.

*Held, further*, TS validly designated DP to act on his behalf during a period that included the date on which DP signed P–H's closing agreement. TS's position description establishes that he was a "supervisory official," within the meaning of Delegation Order 1-2, *Internal Revenue Manual* 1.2.40.3 (Aug. 29, 1996), authorized to designate others to act on his behalf. TS's file memo and email exchange with DP were sufficient to effect the designation of DP to act in TS's position.

*Held, further*, P–H's closing agreement cannot be set aside under I.R.C. § 7121(b) because of a misrepresentation of material fact. Ps' misrepresentation arguments simply repeat those considered and rejected in *Smith v. Commissioner*, 159 T.C. 33 (2022).

————

Michael W. Aubin and Kerry A. Aubin, pro sese.

*Anne M. Craig* and *Melinda K. Fisher*, for respondent.

[*3]                    MEMORANDUM OPINION

HALPERN, *Judge*: This case is before us on respondent's Motion for Partial Summary Judgment. In his Motion, respondent asks that we uphold a closing agreement in which petitioner Michael Aubin waived his right to elect under section 911(a)[1] to exclude from his gross income for the taxable years ended December 31, 2015, 2016, and 2017, amounts he earned from his employment by Northrop Grumman International, Inc. (Northrop Grumman), at the Joint Defense Facility Pine Gap (Pine Gap) in Australia. For the reasons explained below, we will grant respondent's Motion.

*Background*

In April 2021, the parties submitted a First Stipulation of Facts. One of the attachments to the Stipulation is a document labeled Exhibit 3-J, which the parties described as "a copy of a document titled 'U.S. Treasury Department – Internal Revenue Service: Closing Agreement as to Final Determination Covering Specific Matters' . . . signed by petitioner Michael W. Aubin and Deborah Palacheck." The Stipulation states: "[A]ll exhibits referred to herein and attached hereto may be accepted as authentic." Each party reserved "the right to object to the admission of . . . exhibits in evidence on the grounds of relevancy and materiality, but not on other grounds unless expressly reserved herein." Petitioners reserved no additional rights to object to Exhibit 3-J.

Before its operative provisions, the closing agreement sets forth ten recitals. The second recital refers to the taxation of Mr. Aubin's wages from Northrop Grumman under Australian internal law. It states that "any wages, allowances, benefits and other emoluments paid or provided to [Mr. Aubin] as consideration for services performed for [Northrop Grumman] in Australia, hereinafter referred to as income, are subject to taxation by the Government of the Commonwealth of Australia."

The third recital describes agreements entered into between the United States and Australia regarding the Pine Gap facilities. It states:

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26, U.S.C. (Code), in effect for the years in issue, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect for those years, and Rule references are to the Tax Court Rules of Practice and Procedure in effect at the relevant times.

**[*4]**     Article 9 and Article X of the Agreements between the Government of the United States of America and the Government of the Commonwealth of Australia relating to the establishment of a Joint Defense Space Research Facility and a Joint Defense Space Communications Station, effective December 9, 1966, and November 10, 1969, respectively, provide that such income shall be deemed not to have been derived in Australia, provided it is not exempt, and is brought to tax, under the taxation laws of the United States . . . .

The fourth recital states that the agreement covers the taxable years ended December 31, 2015, 2016, and 2017. The sixth recital states that Mr. Aubin's waiver of his right to elect under section 911(a) "is pursuant to an agreement with and a determination by the Competent Authority for the United States after consultation with the Competent Authority for Australia in accordance with Article 24 of the Income Tax Convention between the United States and Australia."

Turning to the agreement's operative provisions, section (a)(1) provides that Mr. Aubin "shall not at any time during or after his . . . presence in Australia make any election under code section 911(a)[2] with respect to income paid or provided to [him] as consideration for services performed for [Northrop Grumman] at [Pine Gap]." Section (a)(2) of the agreement provides that Mr. Aubin "irrevocably waives and foregoes any right that he . . . may have to make any election under Code section 911(a) with respect to income paid or provided to [him] as consideration for services performed for [Northrop Grumman] at [Pine Gap]."

With their response to respondent's Motion for Partial Summary Judgment, petitioners, who resided in Colorado when they filed their Petition, submitted an affidavit of Australian tax lawyer Terry Dwyer. The attachments to Dr. Dwyer's affidavit include a document titled "Instructions and Explanation for U.S. Citizens Employed at the Joint Defense Space Communications Station and the Joint Defense Space Research Facility to Claim an Exemption From Australian Income Tax." Dr. Dwyer describes the document as having been "issued by the Commissioner of Taxation and agreed with the US Internal Revenue Service." The Instructions state that the described procedures were

---

[2] Section 911(a) allows a "qualified individual" to elect to exclude from gross income the individual's "foreign earned income."

[*5] developed by "representatives from the U.S. Internal Revenue Service and the Australian Taxation Office" "[p]ursuant to the authority vested in Article 24 of the Income Tax Convention between the United States and Australia."

Mr. Aubin's closing agreement includes a signature dated January 6, 2015, over the line "Your signature." The signature "Deborah Palacheck for Theodore Setzer" appears beneath "Commissioner of Internal Revenue." Beneath that signature is the title "Acting Assistant Deputy Commissioner International," which was Mr. Setzer's title on September 28, 2015, the date on which Ms. Palacheck signed the agreement.

The position description for the Assistant Deputy Commissioner (International) adopted in December 2011 states that the holder of that position is "responsible for planning, developing, directing, and implementing a comprehensive, Servicewide, tax treaty administration program that enhances compliance with international tax laws and tax treaties." The holder's "Major Duties" include "[f]unctionally manag[ing] and assist[ing] in directing the development of the design and execution of international tax administration programs and advisory tax administration services to foreign governments." Those Major Duties also include "[a]ssisting the DCI [Deputy Commissioner (International)] in providing executive leadership and direction to a nationwide international staff through subordinate executives and managers that [sic] are geographically dispersed throughout the country." The holder of that position "[d]elegates sufficient authority to subordinates to effectively manage their resources and to provide a supportive environment for creativity and innovation within the parameters of the law."

Mr. Setzer's position description also states: "The incumbent performs the functions of the Competent or Taxation Authority in administering the operating provisions of tax conventions of the United States." It adds that "[t]he incumbent is delegated broad authority to execute responsibilities within legal, regulatory, and budgetary limitations."

The parties submitted a declaration of Mr. Setzer as part of their Second Stipulation of Facts. In his declaration, Mr. Setzer states: "I authorized Deborah Palacheck to act for me as Assistant Deputy Commissioner (International) on September 28, 2015." Mr. Setzer's declaration is accompanied by two exhibits. Exhibit A to the declaration

**[\*6]** is a file memorandum dated September 17, 2015, in which Mr. Setzer delegated to Ms. Palacheck and another official the authority to act as Assistant Deputy Commissioner (International) during specified periods. Mr. Setzer delegated to Ms. Palacheck the authority to act in his stead "from Monday, September 21 through Friday, September 25, 2015." Exhibit B to Mr. Setzer's declaration is an email exchange between him and Ms. Palacheck. On September 23, 2015, Mr. Setzer asked Ms. Palacheck: "[W]ould you be willing to continue to serve as an actor for me when I am in Rome next week?" Minutes later, Ms. Palacheck responded that she would.

On December 15, 2023, petitioners submitted a Motion in Limine, asking that we "exclude the Closing Agreement from evidence for the time being." Petitioners appeared to argue that the closing agreement was not subject to the business records exception to the hearsay rule, Rule 803(6) of the Federal Rules of Evidence, because "the source of the Closing Agreement and circumstances surrounding it lack trustworthiness." In support of that argument, petitioners referred to testimony in another case before the Court that, by their description, raised the possibility of forgery of signatures of Pine Gap employees on closing agreements such as Mr. Aubin's. "Based on these circumstances suggesting fraud and criminality regarding signatures on the purported Closing Agreements," petitioners advised us, Mr. Aubin "no longer stipulates that he signed the purported Closing Agreement." Petitioners' Motion in Limine made no mention of Rule 91(e), which provides:

> A stipulation will be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or as agreed by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so if justice requires.

In asking that we exclude the closing agreement from evidence because of questions about the authenticity of Mr. Aubin's signature on that agreement, petitioners' Motion in Limine, in effect, asked that we allow them to contradict express stipulations that Mr. Aubin *had* signed the agreement. But the Motion in Limine offered us no reason why "justice require[d]" that we do so. Consequently, on the basis of Rule 91(e), we denied petitioners' Motion in Limine in an Order dated December 18, 2023 (December 18 Order). We also "caution[ed]

**[\*7]** petitioners that taking frivolous positions may result in the imposition of sanctions" under section 6673(a)(1).

In response to the December 18 Order, petitioners promptly submitted a document they styled "Objection to Suggestion of Frivolity." We styled the document an Objection to our denial of petitioners' Motion in Limine.

*Discussion*

I.  *Inclusion of Closing Agreement in Record; Authenticity of Mr. Aubin's Signature*

In their Objection to our denial of their Motion in Limine, petitioners acknowledge—as they neglected to do in their Motion—that "Rule 91(e) permits a court to [allow a party to] qualify, change, or contradict a stipulation 'if justice requires.'" They cite two opinions in which "appellate courts provid[ed] guidance on relief from stipulations." In each of those opinions, *Vallejos v. C.E. Glass Co.*, 583 F.2d 507 (10th Cir. 1978), and *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543 (9th Cir. 1987), *aff'g* T.C. Memo. 1986-23, the appellate court upheld a trial court's decision to enforce a challenged stipulation. In *Vallejos*, 583 F.2d at 511, however, the Court of Appeals for the Tenth Circuit offered "a change of conditions" as an example of the type of "special circumstances" that might "justify[] relief from [a] stipulation to prevent manifest injustice." Petitioners' argument, as we understand it, is that an allegation of forgery they claim to have been made in another case constitutes a "change in conditions" that justifies relieving them of their stipulation that Mr. Aubin signed Exhibit 3-J.

The December 18 Order did not address petitioners' Rule 91(e) argument because they did not make an argument under that Rule (or even acknowledge the Rule's relevance) until they submitted their Objection to our denial of their Motion in Limine. Therefore, before turning to the merits of respondent's Motion for Partial Summary Judgment, we will address petitioners' belated Rule 91(e) argument. For the reasons explained below, we reject that argument and will thus continue to treat the closing agreement as part of the record.

We are unpersuaded that, if allegations of forgery have been made in another case, "manifest injustice" would result from holding petitioners to their stipulation that Mr. Aubin signed Exhibit 3-J. Forgery sometimes occurs. That prospect is not new information. But Mr. Aubin knows—or certainly *should* know—whether he signed

**[\*8]** Exhibit 3-J. Petitioners stipulated that he did. Tellingly, in seeking to withdraw that stipulation, petitioners do not deny that Mr. Aubin signed the agreement. They seem to want to use the allegations of forgery in another case as an excuse to place on respondent the burden of establishing Exhibit 3-J's authenticity.[3] Requiring respondent to prove facts within petitioners' knowledge would be contrary to Rule 91(a)'s mandate that parties stipulate relevant matters "to the fullest extent to which complete or qualified agreement can or fairly should be reached." Justice thus does not require putting respondent to the task of establishing what petitioners have already stipulated— particularly when they make no claim that the stipulation is incorrect. Simply put, that forgery *may have* occurred in another case does not justify relieving petitioners of their stipulation that it *did not* occur in this case.

We therefore stand by our denial of petitioners' Motion in Limine to exclude the closing agreement from evidence. We will consider that agreement, submitted as Exhibit 3-J to the First Stipulation of Facts, as part of the record in determining whether respondent is entitled to partial summary judgment that the agreement is valid.

II.    *Applicability of Section 7121*

Section 7121 authorizes the Secretary[4] to enter into written agreements "relating to the liability of [a] person . . . in respect of any internal revenue tax for any taxable period." Once a closing agreement is approved by the Secretary or his delegate, the agreement is "final and conclusive . . . except upon a showing of fraud or malfeasance, or misrepresentation of a material fact." § 7121(b).

---

[3] Again, petitioners' Motion in Limine sought only "to exclude the Closing Agreement from evidence *for the time being*." They accept that respondent could eventually have the document admitted under what they call "the traditional method," that is, based on "personal testimony from individuals with first-hand knowledge." Admission of Exhibit 3-J on the basis of testimony, however, would be impossible if Mr. Aubin's signature on the document truly was forged. Therefore, petitioners' objective seems limited to causing inconvenience and delay.

[4] Section 7701(a) defines "Secretary" to mean "the Secretary of the Treasury or his delegate." The term "delegate," "when used with reference to the Secretary of the Treasury, means any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context." § 7701(a)(12)(A)(i).

**[\*9]** For an agreement to be covered by section 7121, it must relate to a taxpayer's tax liability. Petitioners take that statutory requirement to mean that an agreement to which section 7121 applies must address "an actual liability." Petitioners apparently reason that, if Mr. Aubin's agreement is not entitled to the protections afforded by section 7121, it could be set aside on grounds other than those listed in section 7121(b), such as a failure of consideration.

We can readily reject petitioners' argument that section 7121 does not apply to Mr. Aubin's agreement. True, when Mr. Aubin signed the agreement, none of the tax years to which the agreement related had ended, and two of those years had not yet begun. Under section 7121(a), however, a closing agreement can address a taxpayer's liability for "any taxable period." The Statement of Procedural Rules, 26 C.F.R. § 601.202(a)(2), confirms that "[c]losing agreements under section 7121 of the Code may relate to any taxable period ending prior or subsequent to the date of the agreement."[5] We therefore conclude that, under section 7121, if the agreement Mr. Aubin signed was "approved by the Secretary," the agreement is "final and conclusive" and can be set aside only "upon a showing of fraud or malfeasance, or misrepresentation of a material fact."

III.   *Approval by the Secretary*

We now turn to the question of whether the closing agreement in issue was approved by the Secretary. Given the statutory definition of "Secretary," an agreement is approved by the Secretary if it is approved by an authorized delegate. By regulation, the Secretary has delegated to the Commissioner the authority to sign closing agreements. *See* Treas. Reg. §§ 301.7121-1(a), 301.7701-9(b). Whether Mr. Aubin's closing agreement was validly approved on the Commissioner's behalf turns on two questions. First, did Mr. Setzer have the authority to sign the agreement on the Commissioner's behalf on September 28, 2015? Second, if so, did Mr. Setzer validly delegate his authority to Ms. Palacheck?

---

[5] Because Mr. Aubin's closing agreement covers taxable years ending after the date it became effective, the agreement provides that "it is subject to any change in or modification of the law enacted subsequent to" that date, as required by Treasury Regulation § 301.7121-1(c). Petitioners point to no change or modification in the law enacted after September 28, 2015, that bears on the agreement's operative provisions.

**[\*10]** A.    *Mr. Setzer's Authority*

In support of a prior Motion for Partial Summary Judgment upholding the closing agreement's validity, respondent contended that Mr. Setzer had the authority to sign Mr. Aubin's closing agreement under Delegation Order 8-3, *Internal Revenue Manual* (IRM) 1.2.47.4. (Aug. 18, 1997).  Respondent acknowledged that the position in which Mr. Setzer served (in an acting capacity) on September 28, 2015, is not among those to which Delegation Order 8-3 delegates the authority to sign closing agreements that involve specific applications of an income tax treaty.  Respondent nonetheless argued that Mr. Setzer had the authority under Delegation Order 8-3 to sign Mr. Aubin's closing agreement because Mr. Setzer's position was "substantially similar" to the positions listed in the relevant paragraphs of the delegation order. For the reasons explained in an Order dated June 8, 2023 (June 8 Order), we rejected that argument and denied respondent's prior Motion.

In the Motion now before us, respondent does not renew his argument that Delegation Order 8-3 gave Mr. Setzer the authority to sign Mr. Aubin's closing agreement.  Instead, following a suggestion in the June 8 Order, respondent now argues that the position description for the Assistant Deputy Commissioner (International) gave Mr. Setzer the requisite authority.

While "[t]he development of a delegation order" is the "preferred" method for effecting a delegation of authority, other forms of delegation may be permissible.  *See* IRM 1.11.4.3 (Oct. 10, 2008).[6]  In particular, "[p]osition descriptions and other documents that describe an official's duties with particularity are sufficient to provide the official with the authority necessary to carry out such duties."  *Id.* 1.11.4.3(4).

Petitioners do not address respondent's argument that Mr. Setzer's position description gave him the authority to sign Mr. Aubin's closing agreement.  Instead, they assert:  "Not a single Delegation Order authorizes the Directory [sic], Treaty Administration to execute a Closing Agreement."  Leaving aside that Mr. Setzer was the Acting Assistant Deputy Commissioner (International), not the

---

[6] IRM 1.11.4.3(2) provides that "[t]he development of a delegation order . . . is mandatory when litigation over the activity reasonably can be expected."  Petitioners make no argument that litigation over the authority granted to the Assistant Deputy Commissioner (International) could reasonably have been expected when the description of that position was adopted.

[*11] Director, Treaty Administration, respondent no longer relies on any delegation order for Mr. Setzer's authority.

Mr. Setzer's position description gave him the authority to sign Mr. Aubin's closing agreement if that agreement related to the administration of the Convention for Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Austl.-U.S., Aug. 6, 1982, 35 U.S.T. 1999 (1982 Treaty). Petitioners contend that Mr. Aubin's closing agreement "does not stem from the application of the U.S.-Australia income tax treaty and does not discuss specific applications of the tax treaty." We accept that it may be difficult to identify a specific provision of the 1982 Treaty that Mr. Aubin's closing agreement interprets or applies. Even so, we conclude that the agreement has a sufficient nexus to the treaty for Mr. Setzer to have been an appropriate official to sign the agreement.

In *Smith v. Commissioner*, 159 T.C. 33 (2022), we addressed the validity of a closing agreement signed by Ms. Palacheck in her own right as the Director, Treaty Administration. In the closing agreement at issue in *Smith*, as with the one now before us, a Pine Gap employee waived his right to make an election under section 911(a). We concluded in *Smith*, 159 T.C. at 53, that Ms. Palacheck acted within the authority delegated to her because, in signing the agreement, "she was acting as competent authority with respect to a specific application of the 1982 Treaty."

We did not single out in *Smith* a specific provision of the 1982 Treaty whose application raised an interpretive question resolved by the taxpayer's waiver of his right to elect under section 911(a). Instead, we simply noted that the 1982 Treaty was among the authorities that had to be consulted in "[d]etermining the appropriate result." *Smith*, 159 T.C. at 53. We did not identify any provision of the 1982 Treaty that mandated a result different from the result that would have obtained in the treaty's absence.

Our opinion in *Smith* thus makes clear that we need not identify a specific treaty provision in issue for Mr. Setzer to have had the authority to sign Mr. Aubin's closing agreement. That agreement had a sufficient nexus to the 1982 Treaty because it implemented a procedure established by the authorities designated by Article 24(2) of the treaty to "resolve . . . difficulties or doubts arising as to the [treaty's] application or interpretation." 35 U.S.T. at 2052. Petitioners dismiss the invocation of Article 24 in the closing agreement's fifth recital as a "false reference"

[*12] because, they contend, the agreement "does not resolve any application of the treaty." The Instructions Dr. Dwyer submitted with his affidavit, however, confirm that those who developed the closing agreement procedure understood themselves as having been acting under Article 24.

Moreover, Mr. Setzer's responsibilities as Acting Assistant Deputy Commissioner (International) went beyond treaty matters. His duties extended to "international tax administration programs" more broadly. Mr. Aubin's closing agreement involved the administration of a provision governing the U.S. tax treatment of foreign earned income. The agreement can thus readily be viewed as part of an "international tax administration program." Mr. Setzer would have had the authority to sign Mr. Aubin's closing agreement even if petitioners were correct that the agreement had nothing to do with the 1982 Treaty.

We therefore conclude that Mr. Setzer had the authority, on September 28, 2015, to sign the closing agreement in which Mr. Aubin waived his right to make an election under section 911(a) for the taxable years ended December 31, 2015, 2016, and 2017. The authority granted to Mr. Setzer by the description of the position in which he served encompassed the administration of tax treaties and, more generally, international tax administration. Mr. Aubin's agreement was related to the administration of the 1982 Treaty in that it implemented a procedure developed by the relevant authorities under the color of Article 24 of the treaty. And more generally, the agreement involved the implementation of one of the international provisions of the Code.

B.    *Delegation by Mr. Setzer to Ms. Palacheck*

Accepting that Mr. Setzer had the authority to sign Mr. Aubin's closing agreement, we now consider whether Mr. Setzer validly delegated his authority to Ms. Palacheck, the official who actually signed the agreement on the Commissioner's behalf. Delegation Order 1-2, IRM 1.2.40.3, grants to "[a]ll supervisory officials" the authority "[t]o designate acting supervisory officials in the Internal Revenue Service." Respondent argues that Mr. Setzer, "[i]n his position as Assistant Deputy Commissioner (International) . . . was a supervisory official." In support of that claim, respondent cites the file memorandum in which Mr. Setzer purported to delegate to Ms. Palacheck and another

**[\*13]** official the authority to act, during specified periods, as Assistant Deputy Commissioner (International).[7]

Mr. Setzer's file memorandum does not establish that he was a "supervisory official" within the meaning of Delegation Order 1-2. That Mr. Setzer purported to designate Ms. Palacheck and the other official to act in his stead does not mean he had the authority to do so.

Nonetheless, we accept that Mr. Setzer was a "supervisory official" given the authority, under Delegation Order 1-2, to designate others to act on his behalf. The IRM does not adopt a specialized definition of "supervisory official." We therefore interpret the term in accordance with its ordinary meaning as one who supervises others. The position description for the Assistant Deputy Commissioner (International) makes clear that the responsibilities of the person serving in that position include the supervision of subordinates. As a supervisory official, Mr. Setzer had the authority under Delegation Order 1-2 to designate Ms. Palacheck to act in his stead.[8]

We next turn to the question of whether Mr. Setzer *did* delegate to Ms. Palacheck the authority he had by virtue of his position. In the

---

[7] Mr. Setzer's file memorandum was attached as an Exhibit to a Declaration of his that the parties submitted as part of their Second Stipulation of Facts. The parties agreed that the Exhibits attached to their Second Stipulation, like those submitted with their First Stipulation, "may be accepted as authentic." And the Second Stipulation (like the First) further stated: "[E]ither party has the right to object to the admission of . . . exhibits in evidence on the grounds of relevancy and materiality, but not on other grounds unless expressly reserved herein." Petitioners did not reserve any objection to Mr. Setzer's file memorandum. They did, however, move to strike from the record Mr. Setzer's "out-of-court statements regarding his absence from his office at the Internal Revenue Service" on the ground that those statements were "inadmissible hearsay." Although petitioners' Motion to Strike did not refer to specific statements, we understood petitioners to have been referring to Mr. Setzer's Declaration and its attached Exhibits. In denying petitioners' Motion, we observed that petitioners had not reserved a hearsay exception to Mr. Setzer's declaration and that they were bound by that stipulation. Petitioners later made another Motion to Strike that we viewed as "similar" to their prior Motion. We thus denied the duplicative Motion. Petitioners have thus three times moved to exclude from the record documents which they had previously stipulated.

[8] Mr. Setzer could not have designated Ms. Palacheck to act in his stead if he had himself been designated under Delegation Order 1-2 to act as Assistant Deputy Commissioner (International). Authority granted by Delegation Order 1-2 cannot be redelegated. IRM 1.2.40.3(4). Mr. Setzer, however, was not "designated" to act as Assistant Deputy Commissioner (International) under Delegation Order 1-2. He was instead "detailed" to that position under 5 U.S.C. § 3341. His detail to that position covered the period from July 12, 2015, to January 9, 2016.

**[\*14]** motion now before us, respondent asserts that Mr. Setzer "had duly authorized Deborah Palacheck to act for him as Assistant Deputy Commissioner (International)." In making that assertion, respondent relies on Mr. Setzer's Declaration and its accompanying Exhibits.

A party's motion for summary judgment may be accompanied by supporting affidavits, declarations, or other materials. Rule 121(c). Rule 121(d) provides:

> When a motion for summary judgment is made and supported as set forth in this Rule, the nonmovant may not rest on the allegations or denials in that party's pleading. The nonmovant must respond, setting forth specific facts and supporting those facts as required by Rule 121(c), to show that there is a genuine dispute of fact for trial. If the nonmovant does not so respond, a decision may be entered against that party.

Respondent has supported his Motion for Partial Summary Judgment with Mr. Setzer's Declaration, as contemplated by Rule 121. It is thus incumbent upon petitioners "to show that there is a genuine dispute," Rule 121(d), as to whether Mr. Setzer designated Ms. Palacheck to act on his behalf on September 28, 2015.

Petitioners dismiss as "bogus" and "bordering on baseless frivolity" respondent's claim that Mr. Setzer's email exchange with Ms. Palacheck on September 23, 2015, extended her authority to act on Mr. Setzer's behalf from September 25 to October 2, 2015. "Even if [Mr. Setzer] somehow had authority" to sign Mr. Aubin's closing agreement, petitioners contend, "an email was not a proper delegation of the questionable and challenged alleged authority." Petitioners cite no authority, however, for that contention.

We have already concluded that Mr. Setzer had the authority, under Delegation Order 1-2, to designate others to act on his behalf. Delegation Order 1-2 does not specify any particular means by which those designations can be effected. We therefore conclude that, with his file memorandum of September 17, 2015, Mr. Setzer designated Ms. Palacheck to act on his behalf from September 21 to 25, 2015, and that his email exchange with Ms. Palacheck extended that designation through October 2, 2015.

It follows from what we have said thus far that the closing agreement in which Mr. Aubin waived his right to make an election

[*15] under section 911(a) for the taxable years ended December 31, 2015, 2016, and 2017, was "approved by the Secretary" within the meaning of section 7121(b). Consequently, under that section, we can set the agreement aside only "upon a showing of fraud or malfeasance, or misrepresentation of a material fact."

IV.    *Malfeasance; Misrepresentation*

Petitioners make no allegation of fraud. In their Response to respondent's pending Motion, however, they claim that "the purported Closing Agreements [sic] contained material misrepresentations of foreign law that are legally treated as material misrepresentations of fact under prevailing contract law warranting recission, and the IRS acquired the signatures through criminal violations of 26 U.S.C. § 6103, which constitutes malfeasance mandating the recission of the Closing Agreement."

The June 8 Order rejected petitioners' arguments about malfeasance due to violations of section 6103. The arguments petitioners advance in their Response to respondent's pending Motion simply repeat arguments we have already rejected. We thus reject them again, for the reasons explained in the June 8 Order.

Petitioners argue that Mr. Aubin's closing agreement "contains three different material misstatements of law." Petitioners focus on the agreement's second, third, and sixth recitals. Petitioners describe the second recital, addressing the taxation of Mr. Aubin's wages from Northrop Grumman under Australian internal law, as a "material misstatement," alleging that income earned by Pine Gap employees is entitled to an exemption from Australian tax regardless of any election under section 911(a) of the U.S. Code. Petitioners contend that the agreements referred to in the third recital "do not govern tax liability in Australia" because "treaties have no legislative force unless they are enacted into law by Parliament." "More importantly," they argue, "the Pine Gap Agreement[s] ha[ve] no legal power to alter U.S. domestic law." Petitioners apparently read the second and third recitals to indicate "that the execution of the Closing Agreement and foregoing a domestic U.S. tax right is required to avoid Australian taxation." They characterize that premise as "a material misrepresentation of U.S. law." Finally, they challenge the accuracy of the sixth recital, regarding the agreement between the U.S. and Australian competent authorities, contending that the United States and Australia "have not entered into

**[\*16]** a Competent Authority arrangement relating to income earned at [Pine Gap].”

The taxpayer in *Smith* made the same misrepresentation arguments, and we rejected each of them. For that reason, as we noted in the June 8 Order, petitioners seemed to have abandoned their misrepresentation arguments after we issued our opinion in *Smith*. Now, inexplicably, petitioners have renewed those arguments without acknowledging our rejection of them in *Smith*. (Petitioners’ Response to respondent’s Motion for Partial Summary Judgment makes no mention of *Smith*, leading us to wonder whether it simply recycles material prepared—for this or another case—before we issued our *Smith* opinion.)

We reject petitioners’ misrepresentation arguments for the same reasons that we rejected them when made by the taxpayer in *Smith*. If the second recital (regarding the taxation of Mr. Aubin’s wages under Australian law) is incorrect, it is a misstatement of law. Under section 7121(b), a misrepresentation provides grounds to set aside a closing agreement only if it is a “misrepresentation of a material fact.” Petitioners argue that “material misrepresentations of foreign law . . . are legally treated as material misrepresentations of fact under prevailing contract law.” Closing agreements, however, are governed by statute—not by “prevailing contract law.” Although we recognized in *Smith*, 159 T.C. at 72, that the distinction between statements of fact and statements of law “has, generally speaking, eroded over time in the context of equitable rescission of contracts,” we declined to elide that distinction in applying section 7121. “[G]iven the longstanding distinction between” statements of fact and statements of law, we declined to assume “that Congress intended to include misrepresentations of *law* when it specifically set forth only misrepresentation of material *fact* as a ground for recission in section 7121(b).” *Smith*, 159 T.C. at 72.

As we observed in *Smith*, 159 T.C. at 71, the third recital “is an entirely accurate statement of the express terms” of the Pine Gap agreements. And, regarding the sixth recital, we accepted as true that “the procedure the [Internal Revenue Service] follows when entering into closing agreements with Pine Gap employees was developed in consultation with the Australian competent authority following the process Article 24 of the 1982 Treaty provides.” *Id.* at 70 n.46. In short, petitioners’ arguments that Mr. Aubin’s closing agreement can be set aside because of misrepresentation are contrary to our opinion in *Smith*.

**[*17]** We rejected those very arguments in *Smith* and we reject them again here.

V.    *Conclusion*

In sum, because the closing agreement in which Mr. Aubin waived his right to make an election under section 911(a) for the specified taxable years is part of the record and was "approved by the Secretary," within the meaning of section 7121(b), that agreement can be set aside only "upon a showing of fraud or malfeasance, or misrepresentation of a material fact." Mr. Setzer had the authority to sign the closing agreement by virtue of the description of the position of Assistant Deputy Commissioner (International) because the agreement related to international tax administration in general and administration of the 1982 Treaty in particular. As a supervisory official, Mr. Setzer had the authority under Delegation Order 1-2 to designate Ms. Palacheck to act in his stead, which he did for the period from September 21 to October 2, 2015. The date on which Ms. Palacheck signed the agreement on Mr. Setzer's behalf, September 28, 2015, was within that period. Petitioners make no allegation of fraud. Their allegations of malfeasance simply repeat arguments we considered and rejected in the June 8 Order. And their arguments about misrepresentation repeat arguments we considered and rejected in *Smith*. Petitioners have not established a genuine dispute of fact or that respondent is not entitled to judgment as a matter of law on the question of the validity of Mr. Aubin's closing agreement. We therefore conclude that the closing agreement entered into between Mr. Aubin and the Internal Revenue Service covering petitioners' 2015, 2016, and 2017 taxable years is valid. We will therefore grant respondent's Motion for Partial Summary Judgment.

*An appropriate order will be issued.*